**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY**

v.

**PUBLIC UTILITIES COMMISSION et al.**

Supreme Judicial Court of Maine, Kennebec.

Aug. 10, 1976.

---

Pierce, Atwood, Scribner, Allen & McKusick, by Vincent L. McKusick, Everett P. Ingalls, James E. Purcell, Portland, Robert D. Bruce, Boston, Mass., for plaintiff.

Horace S. Libby, Public Utilities Commission, H. Cabanne Howard, Edward Lee Rogers, Asst. Attys. Gen., Augusta, for defendants.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

On October 8, 1974, New England Telephone and Telegraph Company ("New England") filed with the Public Utilities Commission ("Commission"), in compliance with 35 M.R.S.A. § 64,[1] a revision of New England's then effective schedule of intrastate rates, tolls and charges.[2] The revision was designed to achieve an increase in New England's gross annual revenues of approximately $21,000,000 ("the $21,000,000 rates"). After a complex series of events (described in detail below), the Commission, by order dated February 13, 1976, authorized the filing of a schedule which would increase New England's revenues by $9,074,000. On February 23, 1976, New England initiated the instant proceedings for judicial review invoking (1) this Court's "appeal" jurisdiction under 35 M.R.S.A. § 303 ("Section 303") and (2) its "complaint in equity" jurisdiction under 35 M.R.S.A. § 305 ("Section 305").

We sustain New England's Section 303 appeal and remand the case to the Commission for further proceedings consistent

---

1. 35 M.R.S.A. § 64 prohibits
   " . . . change . . . in any schedule, . . . except upon 30 days' notice to the commission, . . . ."

2. On October 8, 1974, the rate schedule in effect was that authorized by the Commission on June 13, 1974.

with our opinion herein. We dismiss, without prejudice, New England's Section 305 complaint because our disposition of the Section 303 appeal makes it unnecessary for us to reach the issues raised by the Section 305 complaint.

### I. The History of the Proceedings

In response to the above-described October 8, 1974 rate-filing, the Commission, on November 6, 1974, acting pursuant to 35 M.R.S.A. § 69,[3] suspended the entirety of the schedule proposed by New England and thus prevented its taking effect.[4] The Commission then proceeded with hearing and investigation, as authorized by said Section 69.

Cross-examination of New England's direct case [5] was originally scheduled for the week of April 14, 1975, but was later moved to May 5, 1975 to allow the Commission additional time for preparation. Hearings began on May 5, 1975, as scheduled, but were suspended because the retirement of Commissioner John G. Feehan created a vacancy in the Commission. The Commission stated that it was reluctant to process so large and important a rate case with only two Commissioners sitting.

On May 9, 1975 the then Commission Chairman, Peter A. Bradford, wrote a letter to all parties in which he indicated that the hearings were suspended "until the

Commission once again has three members." Chairman Bradford expressed the hope that the case could be completed by July 7, the expiration of the statutory suspension period, but also suggested that "there seems to be a substantial probability that this will be impossible." The letter further stated:

"The Commission does not intend that the company [New England] should be financially penalized if the proceeding runs beyond July 7 and if the Commission should ultimately find a rate increase to be necessary. Therefore the parties should be considering ways in which this goal might most satisfactorily be achieved. We have previously suggested some combination of interim rates with an eventual surcharge to achieve the same effect as if our final decree had been issued on July 7. . . . [T]he eventual result in this case should be designed to achieve basically the same dollar and cents result as if the decree had been issued on July 7. The Company's [New England's] agreement to waive the July 7 deadline, if necessary, is predicated on such a result."

On June 26, 1975, New England responded by suggesting that the rate schedule filed by it (pursuant to 35 M.R.S.A. § 64) on October 8, 1974 now be put into effect, subject to refund should the Commission eventually determine that the rates con-

---

3. As here material, 35 M.R.S.A. § 69 states: "Whenever the commission receives notice of any change or changes proposed to be made in any schedule of rates filed with said commission under the provisions of law, it shall have power at any time before the effective date of such change or changes, . . . . to hold a public hearing and make investigation as to the propriety of such proposed change or changes. . . . "Pending such investigation and order, the commission may at any time within said period preceding the effective date of any such schedule, . . . suspend the operation of such schedule or any part thereof, but not for a longer period than 3 months from the date of said order of suspension. If said investigation cannot be concluded within said period of 3 months, said com-

mission may in its discretion extend the time of suspension for a further period of 5 months."

4. In accordance with 35 M.R.S.A. § 69 the first (November 6, 1974) suspension was for a period of 3 months, and on February 6, 1975, the last day of this initial suspension, a second suspension was ordered by the Commission, for the statutorily prescribed period of 5 months, thus running to July 7, 1975.

5. Pursuant to Commission Rule of Practice and Procedure 4–A, the Commission, on October 30, 1974, ordered New England to present its direct case in written form. This testimony was filed November 7, 1974, the effective date of the first suspension.

tained therein were unreasonable. The Attorney General [6] proposed continuing the then effective (June 13, 1974) rates, subject to surcharge. The Department of Defense proposed an immediate surcharge to remain effective until a final order would be issued. The Commission staff recommended an immediate $10,000,000 rate increase subject to refund or surcharge depending upon the increase, if any, to be allowed by the Commission after further proceedings in the case.

On July 3, 1975, four days before the expiration of the maximum statutory suspension period allowed by 35 M.R.S.A. § 69, the Commission issued a decree containing the provisions that: (1) the decree terminated the statutory suspension period which, otherwise, would have continued until July 7; (2) an effect of the decree was to

"permit the processing of the case beyond the July 7 deadline without the rates as filed by the Company going into effect by operation of law";

(3) the Commission saw

"no justification for permitting the Company to collect $21,000,000 to which it may very well not be entitled",

and rejected New England's plan for putting the $21,000,000 rates in effect subject to refund; (4) New England was authorized to file rates designed to increase gross operating revenues by $9,500,000 per annum ("the $9,500,000 rates")

"subject to refund or surcharge in order that New England receive as nearly as possible the same dollars and cents result that it would have received had . . . [the Commission's] final revenue requirement order been entered on July 7, 1975."

Pursuant to this July 3, 1975 decree, New England, on July 15, 1975, filed with the Commission a revised schedule of rates, tolls and charges designed to increase gross annual revenues by $9,500,000, and the schedule provided that such rates were subject to refund or surcharge depending upon a further order of the Commission. By order of the same date, July 15, 1975, the Commission authorized the revised schedule filed by New England pursuant to the Commission's July 3 order to be effective as of July 16, 1975.

On July 21, 1975, after Mr. Lincoln Smith had become the third member of the Commission, the Commission proceeded with hearings and investigation concerning the determination of the just and reasonable rates to be charged by New England. Hearings concluded on September 2, 1975, and final briefs were submitted on October 6.

On December 11, 1975 New England filed with the Commission a motion to reopen the record. With the motion were copies of New England's monthly financial reports for the period May to September 1975, each report containing a summary for the year ending at the close of that month (e. g., June 1, 1974–May 31, 1975). New England was thus offering to the Commission operating data—presented in the same form as that the Commission had received as evidence during the prior hearings,—showing New England's financial situation for a period as recent as the year ending September 30, 1975. On December 31, 1975, and again on January 22, 1976, New England moved to amend this motion, adding data through October 31, 1975 and November 30, 1975, respectively. Accompanying this last motion for amendment was a request for hearing concerning the reopening of the record.

On February 13, 1976, the Commission issued another decree which was, purportedly, its "final" decree dealing with the revised rate schedule filed, pursuant to 35 M.

6. The Attorney General, along with Mr. Herman Cohen, Combat, Inc., the Maine Innkeepers Association and the Department of Defense had been allowed to intervene.

R.S.A. § 64, by New England on October 8, 1974. This order contained findings concerning various substantive issues presented in the case—fair rate of return, appropriate rate base, deductible expenses, etc. It concluded: (1) the $21,000,000 rates proposed by the October 8, 1974 filing are unjust and unreasonable; (2) "the revised temporary rates" of July 16, 1975 are unjust and unreasonable; (3) New England should file a new schedule of rates, tolls and charges to produce an increase in its annual gross revenues of only $9,074,000—i. e., less than the increase of $9,500,000 previously authorized in July, 1975; (4) New England should file a schedule providing for the refund to those customers who had paid the $9,500,000 rates since July 16, 1975 the amount by which those rates exceeded the $9,074,000 rates, with 9.05% annual interest to be paid thereon; (5) New England should reduce its $32.50 charge for "service connections, moves and changes" instituted by the July 16, 1975 schedule to a maximum of $17, and those persons who had paid these higher charges should have the difference refunded, with interest at the rate of 9.-05%; (6)

> "[i]f these refunds should produce a deficiency in the amount collected under the interim rates, the Company [New England] may make up the difference through an across the board surcharge."

When it subsequently initiated the instant proceedings for judicial review of this Commission order, New England, on February 23, 1976, requested in conjunction with its "Section 305 complaint" that the Chief Justice of this Court stay the effectiveness of the Commission's order.[7] On March 12, 1976, the Chief Justice issued an order staying the February 13, 1976 order of the Commission on the condition

"that the rates placed in effect by the Public Utilities Commission by decrees of July 1975 and which are presently in effect because of the Commission's stay of its own order of February 13, 1976, namely, those orders permitting a rate schedule designed to increase annual gross revenues of the Company by $9,500,000.00, remain in effect, subject to refund or surcharge *if allowable under the law.*" (emphasis supplied)

This stay has been in effect pending our determination of New England's instant Section 305 proceeding.

## II. The Statutory Framework of the Proceedings

Our review of the Commission's actions must proceed in accordance with the postulate that

". . . the Public Utilities Commission possesses only statutory powers. If it exceeds those powers, or, though it has jurisdiction over the subject-matter, proceeds in a manner unauthorized by the statute, or otherwise exceeds its authority, its decrees are of no validity, . . . ." *S. D. Warren Company v. Maine Central Railroad Company*, 126 Me. 23, 25, 135 A. 526, 528 (1926).

The parties agree that New England's rate filing of October 8, 1974 was made pursuant to 35 M.R.S.A. § 64. Hence, under Section 64 the rates, tolls and charges set forth in that schedule would have taken effect as the lawful rates, tolls and charges 30 days after their filing,[8] had not the Commission decided to utilize the powers granted it by 35 M.R.S.A. § 69. Thus acting, the Commission: (1) directed New England to file testimony and such other evidence as it might see fit in support of the proposed rate increase, and (2) ordered

---

7. The order had previously been stayed by the Commission, and this stay was in effect at the time of the motion to the Chief Justice.

8. For a detailed discussion of rate change procedures under our statute, see: *New England Telephone & Telegraph Company v. Public Utilities Commission*, Me., 354 A.2d 753 (1976).

that the proposed schedule be suspended for 3 months. The Commission then proceeded to study the evidence submitted by New England.[9] This study could not be completed before February 7, 1975, the date of the expiration, by law, of the initial 3 months suspension, and which said expiration—were there no further suspension—would permit the proposed $21,000,000 rate increase to become effective by operation of law. The Commission, therefore, acting again under 35 M.R.S.A. § 69, issued a second suspension order, continuing its suspension 5 more months, until July 7, 1975.

After the Commission found it necessary to delay the cross-examination of the evidence submitted by New England beyond early May 1975 because of the retirement of Commissioner Feehan, and the Commission subsequently made its order of July 3, 1975, the posture of the proceedings became as follows: (1) New England had filed a changed schedule of rates, tolls and charges pursuant to 35 M.R.S.A. § 64; (2) the Commission had decided that these rates should be investigated, and had, before the rates became effective, issued an order, under 35 M.R.S.A. § 69, suspending their effectiveness for 3 months; (3) on February 6, 1975, the Commission had issued an order extending that suspension for the additional 5 months allowed by 35 M.R.S.A. § 69; (4) and thus the rates contained in the schedule filed by New England on October 8, 1974 remained on July 3, 1975 "proposed" rates within the purview of Section 69 and, as such, still under investigation by the Commission pursuant to said Section 69.

■ All parties agree that such was the status of these proceedings immediately prior to the issuance of the July 3, 1975 order. There, however, agreement ends.

New England views the framework of the proceedings from and after the Commission's July 3, 1975 order as follows. New England claims that it had *consented* to a *suspension* of the $21,000,000 rates *beyond* July 7, and accepted in return the Commission's promise to authorize a rate increase subject to refund or surcharge, in order that New England should finally receive the same total revenue that it would have received had a final rate order been made on July 7.

The Commission, on the other hand, argues that the July 3, 1975 order, coming as it did before July 7, (1) terminated the running of the final suspension period, but (2) by fulfilling the conditions of the May 5 agreement upon which the Commission relied in suspending the hearings, allowed the *investigation authorized by Section 69* to continue—New England's *agreement* substituting for *Commission suspension* as the mechanism by which the revised rates filed by New England on October 8, 1974 (under Section 64) were prevented from becoming effective, after July 7, 1975, by operation of law.

Thus, whereas New England claims that, by agreement, a utility and the Commission have power to *extend the suspension period* prescribed by statute, the Commission by-passes this issue and asserts, instead, that despite termination (or expiration) of the suspension authorized by Section 69, the Commission may continue to conduct a *Section 69 investigation* so long as the utility agrees that the revised schedule of rates it filed under Section 64 shall not become effective.

We reject each of these interpretations of Section 69.

In *New England Telephone & Telegraph Company v. Public Utilities Commission*,

9. At the same time, the Commission was studying, and holding hearings concerning, a motion by New England for an interim rate increase, to be effective until a permanent rate was approved by the Commission. New England's "appeal" and "complaint" arising from the Commission's denial of this motion constituted the subject matter of our opinion in *New England Telephone & Telegraph Company v. Public Utilities Commission*, Me., 354 A.2d 753 (1976).

Me., 354 A.2d 753 (1976) we undertook a comprehensive review of the history of our statutes relating to public utilities. We there noted that what is now 35 M.R.S.A. § 69 was one of several statutes enacted in 1917, four years after the creation of the Public Utilities Commission, and the enactment of Maine's basic scheme of utility regulation. We pointed out that as originally enacted in 1913,[10] the Public Utilities Act empowered the Commission to investigate utility rates and charges *then in effect*, and, if such were found unjust or unreasonable

> "to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just or reasonable." [11]

We also explained that the original (1913) statutory scheme did not interfere with a utility's ability to make changes, entirely unilaterally, in its rates, tolls and charges. Such changes became effective 10 days after notice of them was given the Commission. Should the Commission believe the filed changes of rates to be unjust or unreasonable, the Commission's *only* course of action would be an investigation and hearing which could culminate in a Commission order that the utility substitute *for its then effective rates* (i. e., the filed changed rates which would have been effective during the period of investigation) rates as fixed by the Commission.[12]

Thus, as mentioned in our prior opinion, inherent in this system of utility regulation was a period of regulatory lag—the time between the effective date of the new rate filed by the utility and the effective date of the Commission-ordered substituted rate. Further, because the system allowed the utility's filed changes of rates to be effective during the investigation period, this lag could cause harm to utility customers

by requiring them to pay unjust or unreasonable rates during the period of the Commission's investigation. P.L.1917, Chapter 131, which includes what is now 35 M.R.S.A. § 69, was designed to deal with this problem. Section 69 granted to the Commission two interrelated powers previously withheld from it: (1) the power to investigate a *"proposed"* change in rates *before* it became effective, and (2) the power to *suspend* the operation of *"proposed"* rate schedule "[p]ending such investigation and order."

Section 69 grants to the Commission power to suspend a *proposed* rate *only* for a *maximum* period of 8 months. Nowhere in Section 69, or in any other section of 35 M.R.S.A., is the Commission vested with authority to extend a suspension beyond this deadline *by agreement or otherwise*. "The Commission has no life except as life is given by the Legislature", *Auburn Water District v. Public Utilities Commission*, 156 Me. 222, 226, 163 A.2d 743, 745 (1960), and the Legislature, in enacting Section 69, chose to set an *absolute* limit to the period of suspension. We, therefore, find unacceptable New England's interpretation of the effect of the July 3, 1975 order. The Commission's order of July 3, 1975 did not effect an extension of the period of suspension because, regardless of agreement by the utility, the law absolutely prohibits extension of a suspension beyond the maximum period stated in the statute.

We also reject the argument of the Commission that the July 3 order terminated the suspension, while "permit[ting] the processing of the case beyond the July 7 deadline . . ." *under Section 69*. The two powers granted the Commission by virtue of Section 69 are interdependent. The Commission may suspend *only* "[p]ending investigation and order." It may *investigate only* a *"proposed* change or changes

---

10. P.L.1913, Chapter 129.

11. P.L.1913, Chapter 129, Section 41 et seq. This same authority to investigate rates and

order substituted rates is now contained in 35 M.R.S.A. §§ 296, 298, and 294.

12. P.L.1913, Chapter 129, Sections 23, 24.

. . . at any time *before the effective date of such change* or changes . . . ." The suspension power granted by paragraph two of Section 69 allows the Commission to *delay*, but not to abolish, "the effective date" of the "proposed" changes. During this period of delay, the changes remain "proposed" and, as such, a proper subject for the investigation authorized by Section 69. At the expiration of this period, if the proposed rates are not found unjust or unreasonable and a substituted rate is not authorized in the meantime, the effective date, delayed but not abolished by the suspension, has arrived. The filed rate is no longer, then, a "proposed" rate; it is an *effective* rate, and, as an *effective* rate, it is beyond the further power of the Commission to investigate *pursuant to Section 69*.[13]

■ We hold, then, that the Commission order of July 3, 1975 did not extend beyond the July 7, 1975 statutory deadline *either* the Section 69 suspension *or* the Section 69 *investigation*. The Commission is without authority to utilize either of such Section 69 powers except during a period absolutely limited to (1) the 30 days during which a Section 64 filing is prevented from becoming effective by the language of Section 64,[14] plus (2) a 3 month initial suspension, plus (3) a 5 month additional suspension.

Having determined that the law precluded the July 3, 1975 order from achieving the result the parties intended in fact, we must determine what the legal effect of the July 3 order was, thereby to delineate the true structure, in contemplation of law, of the instant proceedings.

■ It is clear from the July 3 order that the rates there authorized (the $9,500,000 rates) were intended to remain in effect *only temporarily*. They were to be charged pending a later order of the Commission fixing New England's revenue requirements. As we stated in *New England Telephone & Telegraph Company v. Public Utilities Commission*, Me., 354 A.2d 753 (1976), the Commission's only power to effect a temporary rate derives from 35 M. R.S.A. § 311.[15] We conclude, therefore, that on July 3, 1975, the Commission au-

13. In our prior opinion, *New England Telephone & Telegraph Company v. Public Utilities Commission*, supra, we considered the effect of a Commission decision to suspend *part* of a proposed rate schedule. We there concluded that:
"the 'part' of the schedule which has not been suspended takes actual effect under Section 64 as a change of the utility's permanent rates. It is then no longer a merely 'proposed' change as to which the Commission's powers under Section 69 are operative but has become, rather, an actually effective change of permanent rates beyond the scope of the Commission's Section 69 powers. If the Commission should seek to act against such 'part' of the schedule which, as not suspended, has become an actually effective change of the utility's permanent rates, the Commission may act only through a new proceeding, as instituted under Section 291, Section 296 or Section 298." (n. 6 at p. 764)

14. As Section 69 makes clear, it is during this 30 day period that the Commission must exercise its Section 69 powers, if it is to exercise them at all. Section 69 reads:

"Whenever the commission receives notice of any change or changes proposed to be made in any schedule of rates filed with said commission under the provisions of law, [i. e., 35 M.R.S.A. § 64] it shall have power at any time before the effective date of such change or changes, [i. e., within the 30 days prescribed by § 64] either upon complaint or upon its own motion and after reasonable notice, to hold a public hearing and make investigation as to the propriety of such proposed change or changes."

15. 35 M.R.S.A. § 311 states:
"Whenever the commission shall deem it necessary in order to prevent injury to the business of any public utility or to the interest of the people, or in case of any emergency which the commission may adjudge to exist, it shall have power, temporarily, to alter, amend or, with the consent of the public utility concerned, suspend any existing rates, schedules or orders relating to or affecting any public utility. Such rates so made by the commission shall apply to one or more of the public utilities in this State or to any portion thereof as may be directed by the commission, and shall take effect

thorized the filing by New England of a new schedule of rates, tolls and charges, to be in effect *temporarily*, pending the Commission's determination of New England's revenue requirements and the establishment of a *permanent* rate designed to supply the needed revenue.

■ On July 7, 1975, when the maximum period of suspension allowed by Section 69 would have expired, the result which would have followed in ordinary course would have been that since the period of suspension had expired without a finding that the "proposed" rates were unjust or unreasonable and without the authorization of *substituted permanent* rates, the $21,000,000 rates (filed under Section 64 by New England on October 8, 1974) would have become effective *by operation of law*. Such was not the result, here, however, because New England, having legal capability as the party filing the "proposed" $21,000,000 rates to waive whatever right Sections 64 and 69 conferred upon it to have its "proposed" rates become effective rates by operation of law, *did in fact waive* such right.[16] Moreover, after July 7, 1975 (if not as of July 3rd) the $21,000,000 rates lost their character as *"proposed"* rates, within the purview of Section 69, since, as clarified ante, for the purposes of Section 69 a rate cannot remain "proposed" for more than the maximum period of suspension. Because the $21,000,000 rates had lost their character as "proposed" rates under Section 69, the Commission had no further authority under Section 69 to "investigate" them; the Section 69 proceeding had come to its end.

■ In light of the foregoing conclusions that (1) the rate schedule filed by New England on July 15, 1975 and approved by the Commission on July 16, 1975 (pursuant to the Commission's July 3 order) place *"temporary"* rates in effect, and

(2) the Section 69 proceedings had been terminated we now proceed to determine the true nature of the proceedings, in legal contemplation, which the Commission had conducted *commencing with July 21, 1975* and which produced the Commission's order of February 13, 1976.

35 M.R.S.A. § 296 states:

"Whenever the commission believes that any rate or charge is unjust or unreasonable, or that any service is inadequate or cannot be obtained, or that an investigation of any matter relating to any public utility should for any reason be made, it may, on its own motion, summarily investigate the same with or without notice. If after making such summary investigation the commission becomes satisfied that sufficient grounds exist to warrant a formal public hearing being ordered as to matters so investigated, it shall furnish such public utility interested a written statement giving notice of the matter under investigation. Seven days after such notice has been given, the commission may proceed to set a time and place for a formal public hearing as provided."

35 M.R.S.A. § 306 endows the Commission with further authority, stating:

"The commission may at any time upon notice to the public utility, and after opportunity to be heard as provided in section 293, rescind, alter or amend any order fixing any rate or rates, tolls, charges or schedules or any other order made by the commission, and certified copies of the same shall be served and take effect as provided for original orders."

Finding in these two statutes ample authority for a Commission investigation of the adequacy of the temporary rates authorized by the order of July 3, 1975, we

at such time and remain in force for such length of time as may be prescribed by the commission."

16. That there was such a waiver is not in dispute. Counsel for New England expressly admitted it at oral argument.

decide that (1) it was *these temporary rates* which the Commission was investigating from and after July 21, 1975; (2) this investigation was *not a Section 69 investigation* but was one being conducted *as a new investigation under Section 296—Section 306*; and (3) it was these temporary rates, not the $21,000,000 rates, whih constituted the subject-matter addressed by the Commission's order of February 13, 1976.

### *III. The Effect of the Statutory Framework*

█ Having thus exposed fundamental misconceptions of law embodied in the various actions taken by the Commission and New England during the spring and summer of 1975, we have achieved the appropriately sharp focus to enable us to discern with clarity the real thrust of New England's claim that the Commission erred in refusing to consider, as evidence, data derived from New England's operations *after April 30, 1975.*

In refusing to consider such data, Commissioner Bradford told New England's counsel:

"I think it's the consensus of the Commission, Mr. McKusick, that April [1975] is as late as we're going to go, as in terms of the July 7th decree, April [1975] is the last month that we could conceivably have had. In fact, I think it's more likely that we would have had to stop with March [1975]. Consequently, we don't feel that in terms of what has been the goal throughout this proceeding of achieving a decree and a financial result in terms of a final order issued July 7th that a—that the stopping of the figures effective April 30, [1975] is in any way either confiscatory or unfair and that is the Commission's decision on this point."

It is plain from this statement that the Commission's mistake of law—in wrongly conceiving that it had authority to continue a Section 69 proceeding beyond the 9 month period during which a rate has the status of a "proposed" rate and in erroneously believing that it was still operating within the framework of the original Section 69 investigation—surely contributed to, if it did not dictate, the Commission's decision that it could not consider data which would not have been available to it during the suspension period (i. e., by July 7, 1975). Thus, in light of our conclusion that the proceeding commencing July 21, 1975 was, in legal effect, a *new* investigation pursuant to Section 296—Section 306, concerned with the justness and reasonableness of the $9,500,000 *temporary* effective rates, it becomes further plain, and we so decide, that the Commission committed error of law in excluding from this *new proceeding* data, appearing—at least prima facie—to be relevant and important evidence, on the basis of strictures pertaining to the appropriate conduct of a *different* proceeding, namely, the prior Section 69 investigation which had become terminated.

Because the Commission thus committed error of law in refusing to consider the post-April 1975 data, we sustain New England's Section 303 appeal on this ground and vacate the Commission's order of February 13, 1976 in its entirety. We, therefore, need not concern ourselves with New England's other arguments ascribing error to the Commission for its failure to consider such data, and neither need we reach other claims of error asserted by New England as incident either to its Section 303 appeal or its Section 305 complaint.

We remand the case to the Commission with directions that: (1) the Commission proceed with the further conduct of the new Section 296—Section 306 proceedings which had been commenced on July 21, 1975 as an investigation of the "temporary" rates put into effect on July 15, 1975; and (2) basing its conclusions on such evidence as would be probative and legally admissible *in such new Section 296—Section 306 investigation*, the Commis-

sion shall fix, and order substituted, by New England for the *temporary* rates presently in effect a *permanent* schedule of rates, tolls and charges which the Commission deems just and reasonable.

### IV. The Refund/Surcharge Provision

We deem it advisable to discuss one other facet of this case.

In its July 3, 1975 order the Commission purported to fix rates subject to refund or surcharge. Since we have sustained New England's Section 303 appeal, and set aside the February 13, 1976 order of the Commission as vitiated by underlying error of law, the $9,500,000 rates, as authorized July 3, 1975 and effective July 15, 1975, remain the effective "temporary" rates. Because these may well continue as effective rates pending a potentially lengthy further evaluation by the Commission, and possible further action in this Court, we conclude that the interests of both the utility and the public are best served by a determination at this time of the validity of the refund/surcharge provision of the Commission order of July 3, 1975, and the effect of the refund/surcharge references in the Chief Justice's March 12, 1976 stay.

### IV-A. The Powers of the Chief Justice

In their briefs and at oral argument both New England and the Commission have claimed that the two orders providing for refunds and surcharges (the Commission order of July 3, 1975, and the Chief Justice's order of March 12, 1976) rest upon different foundations. New England and the Commission argue that the refund/surcharge provision of the Chief Justice's order represents an exercise of his powers under 35 M.R.S.A. § 305 and is independent of the refund/surcharge provision in the July 3, 1975 order of the Commission.

We need not presently determine whether Section 305 empowers the Chief Justice to attach to a stay order, as a term and condition deemed proper, a provision for future refunds or surcharges. Whether or not the Chief Justice has such power, we conclude that, here, he did not purport to exercise it.

After reviewing the arguments of the parties, the Chief Justice determined that the Commission's order of February 13, 1976 should be stayed to allow continuation of the status quo ante. Accordingly, the Chief Justice ordered that the $9,500,000 rates should continue in effect, as they had been since July 16, 1975. To continue these rates *in exactly the same posture as they were in effect from and after July 16, 1975* the Chief Justice *continued* the refund/surcharge provision of those rates *"if allowable under the law."*

In continuing the refund/surcharge provision *only* "if allowable under the law", the Chief Justice was not expressing any opinion as to the scope of his own powers under Section 305. Rather, he was simply *continuing* the effect of the July 3, 1975 order *with whatever legal defects that order might contain.* In continuing the refund/surcharge provision "if allowable under the law", the Chief Justice was preserving for this Court's scrutiny the question of the legality of the refund/surcharge provision of the Commission's July 3, 1975 order. The thrust of the Chief Justice's order is to allow the effect of that *Commission* provision to continue after the Commission's February 13, 1976 order, *if the provision was legal on July 3, 1975.* The Chief Justice did not intend to bestow, and did not bestow, upon the refund/surcharge provision any independent validity deriving from his Section 305 powers.

Thus, the validity of the provision, *both before and after the Chief Justice's order of March 12, 1976,* depends entirely upon the *authority of the Commission* to enact rates subject to refund or surcharge.

*IV–B. The Powers of the Commission*

█ It is axiomatic that "the powers of the Public Utilities Commission are derived wholly from statute." *Stoddard v. Public Utilities Commission*, 137 Me. 320, 323, 19 A.2d 427, 428 (1941). This being so, in determining the power of the Commission to authorize a rate subject to refund or surcharge, we must look to the statutes creating the Commission and endowing it with the power to regulate the public utilities of this State.

█ Both New England and the Commission advance arguments in support of a power in the Commission to authorize rates subject to refund or surcharge. We find their arguments unpersuasive, however, and decide that the Public Utilities Commission of the State of Maine lacks authority to attach refund or surcharge provisions to utility rate schedules.[17]

One argument (made by New England) in favor of a Commission power to order refunds and surcharges relies on interpretating 35 M.R.S.A. § 294 to confer a broad authority on the Commission to attach "regulations" to rate schedules—regulations which, it is said, may encompass refund/surcharge provisions.[18]

The first paragraph of Section 294 reads:

"If upon such formal public hearing the rates, tolls, charges, schedules or joint rates shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of chapters 1 to 17, the commission shall have power to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just or reasonable. If upon such public hearing it shall be found that any regulation, measurement, practice, act or service complained of is unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any of the provisions of chapters 1 to 17 or if it is found that any service is inadequate or that any reasonable service cannot be obtained, the commission shall have power to establish and substitute therefor such other regulations, measurements, practice, service or acts, and to make such order respecting and such changes in such regulations, measurements, practice, service and acts as shall be just and reasonable."

The argument now under scrutiny would read this statute to authorize the Commission to make "regulations" imposing conditions upon which the rates shall be collected. It is said that one such regulation has

---

17. Both New England and the Commission present lengthy arguments distinguishing the refund/surcharge provision of the July 3, 1975 order from the surcharge requested by New England in connection with its proceeding before this Court in *New England Telephone & Telegraph Company v. Public Utilities Commission*, supra. Both parties argue that the imposition of a surcharge in the prior case would have been retrospective. Here, by contrast, since both the utility and the public knew, *before the amounts later to be refunded or surcharged accrued*, that a refund or surcharge could be collected, the refund/surcharge provision of the July 3, 1975 order is *prospective* only, and, therefore, not beyond the power of the Commission to implement.

Even if we assume, without deciding, that the refund/surcharge provision of the July 3 order is prospective only, this alone does not provide the requisite authority for the enactment of such a provision. That a statute allowing such provisions might not offend fundamental principles of rate-making in no way indicates that, in the absence of such a statute, the power to make such a provision exists.

18. As we made clear in *New England Telephone & Telegraph Company v. Public Utilities Commission*, supra, Section 294 is the source of the Commission's authority to order utilities to substitute just and reasonable rates for those found unjust and unreasonable, whether the procedure is commenced by complaint by 10 persons aggrieved (35 M.R.S.A. § 291), by the Commission's own motion (35 M.R.S.A. § 298) or by the filing of a revised schedule intended to take effect in 30 days by operation of law (35 M.R.S.A. § 64).

been promulgated here: i. e., the rates authorized by the July 3, 1975 order are conditioned on a refund or surcharge being collected at a later date.

We reject such interpretation of Section 294. As we read the portion of the statute quoted above, two separate provisions are made. If the Commission finds

"the rates, tolls, charges, schedules or joint rates . . . unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of chapters 1 to 17,"

the Commission has power to "fix and order substituted therefor" just and reasonable rates. The power to fix new rates and to order the utility to substitute them is the *only* power *with regard to rates* granted the Commission by Section 294. The power to make "regulations" does not, by the clear language of Section 294, apply to *rates*. The second sentence of the statute authorizes the Commission to act when it finds that "*any regulation, measurement, practice, act or service*" is

"unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any of the provisions of chapters 1 to 17 . . . ."

Upon making such a finding, the Commission "shall have power to establish and substitute therefor" a just and reasonable regulation, etc. and "to make such order respecting and such changes in such regulations" etc., as shall be just and reasonable.

■ We find the language of Section 294 to be an unambiguous expression of the Legislature's desire to delegate to the Commission *only* the authority (1) to examine the charges and practices of public utilities; (2) to determine the justness and reasonableness of those charges and practices; and (3) in the case of a charge or practice found to be unjust or unreasonable, to fix another charge or practice, and

order the utility to substitute this charge or practice for that found unjust by the Commission. It is clear to us that the Commission is authorized *only* to do that which the utility should have done in the first place—conform its acts to the statutory rule of reason.[19] We do not find in Section 294 any intimation that the Legislature intended to enable the Commission, in the process of fixing and ordering substituted for an unjust *rate* one which is just and reasonable, to attach to the *rate* special conditions or regulations which the utility would not have been authorized to include in the first instance. We therefore, conclude that Section 294 does not provide authority for the enactment of a rate subject to refund or surcharge.

■ The Commission and New England join in presenting a second argument to support a power in the Commission to order refunds and surcharges in connection with rate schedules. The Commission and New England maintain that, even absent express statutory authorization for the refund/surcharge provision of the July 3 order, that provision should be upheld as a proper exercise of Commission powers necessarily implied by the statutes. In presenting this "implied powers" argument, New England and the Commission both rely heavily upon a dictum in *City of Rockland v. Camden and Rockland Water Company*, 134 Me. 95, 181 A. 818 (1935). In that case this Court stated, as a general proposition, that:

"The Public Utilities Commission . . . [is] an administrative body of limited, though extensive authority, having such powers as are expressly delegated to it by the Legislature, and incidental powers necessary to the full exercise of those so invested." (p. 97 of 134 Me., p. 819 of 181 A.)

The Commission and New England are correct in viewing this statement as an explicit recognition by this Court that the

---

19. See: 35 M.R.S.A. § 51.

Commission has *some* powers *by implication* beyond those expressly delineated in the statutes.

They go too far, however, in their further claim that the model for this Court to follow in construing the scope of the implied powers of the Maine Commission should be the recent decision of the District of Columbia Court of Appeals in *Chesapeake & Potomac Telephone Company v. Public Service Commission*, D.C., 330 A.2d 236 (1974). That case is not an appropriate guide for this Court because the philosophy and practices of utility regulation in the District of Columbia are fundamentally different from those in the State of Maine.

Under District of Columbia law a utility cannot effect a change in its rates without the approval of the Public Service Commission ("D.C. Commission"). D.C.Code 1973 §§ 43–323, 43–401. When notice of a desired change is received by the D.C. Commission, it responds by scheduling a hearing. D.C.Code 1973 § 43–401. It appears from the *Chesapeake & Potomac* case that a practice has developed by which such hearings are conducted in two phases, the first to determine the utility's revenue requirement, and the second to determine an appropriate rate design to produce the required revenue. Because a utility has no right to have its rate become automatically effective, suspensions and deadlines are not a part of the District of Columbia scheme.

During whatever period is required for hearings and deliberation, no matter how lengthy, the utility's prior rate remains in effect.

A second significant difference appears in the "General Provisions" chapter of the District of Columbia public utilities statute. D.C.Code 1973, § 43–1003 specifically mandates a liberal construction of the public utilities statute, and explicitly delegates to the D.C. Commission:

> "all additional, implied, and incidental power which may be proper and necessary ·to effect and carry out, perform, and execute all the said powers herein specified, mentioned, and indicated. A substantial compliance with the requirements of chapters 1–10 of this title shall be sufficient to give effect to all the rules, orders, acts, and regulations of the commission, . . . ." [20]

Finally, the District of Columbia statute makes no mention of refunds or surcharges.

The difference between this scheme and our own is immediately obvious. The District of Columbia statute absolutely bars rate changes without D.C. Commission approval; by contrast, our statute maintains the right of a utility (as enjoyed before the onset of regulation in 1913) to effect changes in its own rates. Further, and most critically, the Maine Commission is given *not* an absolute authority over rate changes but rather *two* distinct types of

---

**20.** The entire text of this section reads:
"The provisions of chapters 1–10 of this title shall be interpreted and construed liberally in order to accomplish the purposes thereof, and where any specific power or authority is given the commission by the provisions of chapters 1–10 of this title the enumeration thereof shall not be held to exclude or impair any power or authority otherwise in chapters 1–10 of this title conferred on said commission. The commission. hereby created shall have, in addition to the powers in chapters 1–10 of this title specified, mentioned, and indicated all additional, implied, and incidental power which may be proper and necessary to effect and carry out, perform, and execute all the said powers herein specified, mentioned, and indicated. A substantial compliance with the requirements of chapters 1–10 of this title shall be sufficient to give effect to all the rules, orders, acts, and regulations of the commission, and they shall not be declared inoperative, illegal, or void for any omission of a technical nature in respect thereto. That each section of chapters 1–10 of this title, and every part of each section, are hereby declared to be independent sections and the holding of any section or sections or part or parts thereof to be void, ineffective, or unconstitutional for any cause shall not be deemed to affect any other section or part thereof."

*limited* power to respond to a utility's action to change its rates. *As to utilities engaged in the transportation of freight,* the Commission *cannot* prevent the new utility rate from taking effect. However, in the case of a rate *increase* it may, *if it acts within 8 months of the effective date of the new schedule,* find the new rate to be unjust or unreasonable, fix a just and reasonable rate, and require the carrier which has charged the unreasonable rate to refund all sums collected in excess of the rate fixed by the Commission.[21] As to all utilities *not engaged in the transportation of freight,* the Commission's power to protect rate payers from having to pay unjust rates during an investigatory period is *limited entirely* to the power to suspend for a total period of 8 months. In sum, having specifically considered the subject-matter of refunds, the Legislature decided to withhold from the Commission refund powers in relation to utilities *not engaged in the transportation of freight* while conferring this power as to utilities which are engaged in such transportation.

In determining that the power to set a rate subject to refund or surcharge is implied by the District of Columbia statute, the District of Columbia Court of Appeals was free to decide that the possibility of refund/surcharge provisions was not considered by Congress in enacting the District of Columbia statute, but, had Congress considered the matter, it would have bestowed upon the D.C. Commission the authority to impose refund/surcharge provisions on rates. Such a conclusion is not open to us in relation to the Maine statutes. The Maine Legislature *did* consider refund/surcharge provisions, and it decided against authorizing the Commission to impose refunds or surcharges except in cases of rate increases by utilities engaged in the transportation of freight. Were we to

hold that our Legislature intended *by implication* to allow the Commission to attach refund/surcharge conditions to the rates of utilities not engaged in the transportation of freight, we should be implying the existence of an authority which the expressed terms of the statute, amplified by historical perspective, directly contradict.

A final point concerning this matter of implied powers is instructive. The District of Columbia statute *expressly* recognizes that powers not explicitly bestowed by the statute nevertheless reside in the D.C. Commission. Our statute has no such provision. The Maine Legislature has not seen fit to delegate to the Commission an amorphous range of powers not specifically set forth by a particular statutory section or sections. While, as this Court recognized in *City of Rockland v. Camden & Rockland Water Company,* supra, some supplementary powers are necessarily implied by any statutory scheme, it is one thing for a court to recognize that a power *necessary* to the carrying out of a statutory function is implied but quite another for the legislature—in which *alone* the power to regulate utility rates resides in the first instance— *expressly* to bestow upon the administrative body

> "all additional, implied, and incidental power which may be proper and necessary to effect and carry out, perform, and execute all the said powers herein specified, mentioned, and indicated."

In sum, in light of the striking contrast between our statutory scheme of utility regulation and that of the District of Columbia, we conclude that, whatever the law in the District of Columbia, under the Maine statutes the Commission lacks implied power to attach refund/surcharge conditions to utility rates.

---

21. 35 M.R.S.A. § 70. As we noted in *Maine Motor Rate Bureau Re: Increased Motor Common Carrier Rates and Charges on Less than Statutory Notice,* Me., 357 A.2d 518, 522, n. 5 (1976), Section 70 is no longer applicable to motor common carriers of freight. 35 M.R.S.A. § 1554 now provides for *suspension* of their proposed rate changes for 120 days, and has abolished refunds.

New England advances a third argument in support of the refund/surcharge provision,[22] that since the tariff containing this provision *is in effect* and has been the only effective tariff since July 16, 1975, despite a *present* finding that the refund/surcharge provision is unlawful, the provision must be given effect from July 16, 1975 to the date of the present decision which, for the first time, has adjudicated its illegality. Thus, the argument continues, even if the refund/surcharge provision is *now* determined to be unlawful it *was* effective from July 16, 1975 until the present time, and refunds or surcharges have accrued during this time.

The essence of New England's contention is that the $9,500,000 rates which have been in effect since July 16, 1975 were in actuality not an increase of $9,500,000, but rather an increase in some larger amount not yet definitively determined on July 3, 1975, the date of the decree authorizing the rates subject to refund or surcharge. This other amount was properly in effect from July 16, 1975 until the present, the argument continues, and, therefore, refunds or surcharges must be assessed to adjust the rates and charges from July 16, 1975 to the present.

While this may appear a persuasive argument at first glance, it fails to survive closer scrutiny. The argument seems to derive from 35 M.R.S.A. § 66, which states:

"It shall be unlawful for any public utility to charge, demand, collect or receive a greater or less compensation, . . . than is specified in such printed schedules, . . . [on file in every station and office of the utility] as may at any time be in force . . . ."

However, in light of the philosophy embodied in our utilities statute, it is clear that New England's attempt to find in Section 66 a requirement that refunds or surcharges *now* be paid must fail.

The purpose of a refund/surcharge provision is to allow a regulatory body to determine after the fact that a certain rate was, when charged, too high or too low, and to adjust it by refund or surcharge. The ultimate result of such adjustment is that the rate charged during a specified period (here, July 16, 1975 to the present) will be the rate which, it is later determined, was just and reasonable during that period. Our Legislature could have enacted such a system of rate regulation, but it chose not to do so. Instead, it created a system which explicitly recognizes that an unjust or unreasonable rate may be in effect during a certain period. As originally enacted, our statute allowed a utility to put into effect, on 10 days notice, any new rate schedule it chose, whether just or unjust. As presently in effect, the statute authorizes suspension of a rate proposed by a utility. While this suspension continues, the prior rate remains in effect, whether or not such prior rate is just and reasonable.

It is apparent from these provisions that Section 66 is a reflection of the Legislature's concern that *some* rate have legally operative effect at all times. The Legislature, however, did not mandate that the rate legally in effect shall at each moment of its effectiveness be a just and reason-

22. In our analysis, we have made separate references to such arguments as have been offered by the Commission, New England, or both. This should not obscure that New England and the Commission share correlative interests to achieve a decision sustaining a refund/surcharge power in the Commission. The Commission maintains that its February 13, 1976 decree is legal and valid and, in accordance with that decree, *refunds* are due New England's ratepayers. New England's position is that the rates and charges fixed by the February 13, 1976 decree are confiscatory and rates *in excess* of the $9,500,000 rates effected by the July 3, 1975 order are required; hence, there must be a *surcharge* to make up to New England the difference between the $9,500,000 rates and such rates as must be set to avoid confiscation. Thus, the Commission would argue that *refunds* have been accruing since July 16, 1975, and New England claims that *surcharges* have accrued during this period.

able rate. Our statute tolerates regulatory lag, the Legislature having chosen to limit it in time rather than to attempt to cure it by after-the-fact adjustments through refund or surcharge.

We conclude, then, that Section 66 establishes that payments made by rate payers in accordance with the rate schedule on file constitute a full discharge of their obligations. Nothing in that section, nor elsewhere in our public utilities statutes, allows or requires that a rate schedule, or any part thereof, be given an effect *from and after* the time that such schedule or part is found unjust, unreasonable, or unlawful. We decide, that the refund/surcharge provision of the July 3, 1975 order was beyond the authority of the Commission and invalid. Accordingly, we refuse to give it any *future* effect. While, had refunds or surcharges been made and collected before the date of this decision, arguably, they might be allowed to stand as valid *at the time collected* (a question we do not now decide), we cannot countenance their being *collected subsequent to* our decision herein which adjudicates that the Commission was entirely without power to include a refund/surcharge provision in its July 3 order.

■ Counsel for New England and the Commission agreed at oral argument, and we now agree with them, that the refund/surcharge provision is severable from the other provisions of the July 3, 1975 order. Accordingly, we sever the refund/surcharge provision from the other provisions of the July 3, 1975 order of the Commission and hold the refund/surcharge provision to be, for the purposes of its purported operativeness in any respects in the instant case, null and void and entirely without effect.

In summary, (1) New England's Section 303 appeal is sustained and the February 13, 1976 order of the Commission is adjudicated to be without legal effectiveness and is vacated; (2) the case is remanded to the Commission for further proceedings in accordance with the directives contained in this opinion; (3) the refund/surcharge provision of the July 3, 1975 order is adjudicated a nullity; (4) the refund/surcharge provision, being severable, is severed and the other provisions of the schedule of rates, put into effect by New England pursuant to the Commission's July 3, 1975 order (the $9,500,000 rates), being the last lawful rates in effect, are the effective rates; and (5) by virtue of all of the foregoing, it is unnecessary that any of the issues raised by New England's Section 305 complaint be addressed and said complaint is, therefore, dismissed, without prejudice.

The entry is:

(1) New England's Section 303 appeal is sustained; case remanded to the Public Utilities Commission for further proceedings in conformity with this opinion.

(2) New England's Section 305 complaint is dismissed, without prejudice.

All Justices concurring.