STATE OF NORTH CAROLINA _EX REL._ UTILITIES COMMISSION v. NAN-
TAHALA POWER AND LIGHT COMPANY

No. 93PA89

(Filed 7 February 1990)

1. **Electricity § 3 (NCI3d); Utilities Commission § 22 (NCI3d) —
   tax savings — decrease in rates — rulemaking procedure**
   The Utilities Commission acted within its authority when it ordered affected utilities through a rulemaking rather than a ratemaking procedure to decrease their rates to reflect savings resulting from reduced corporate tax rates in the Tax Reform Act of 1986 since (1) the tax reduction affected all utilities uniformly; (2) a large number of utilities were affected, making individual hearings for all inappropriate; and (3) no

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

adjudicative facts were in dispute so as to require a trial-type hearing for each individual utility.

**Am Jur 2d, Public Utilities §§ 177, 232, 240.**

2. **Utilities Commission § 43 (NCI3d) — rates — tax savings — different treatment of electric and telephone utilities — equal protection**

A Utilities Commission rulemaking order requiring affected utilities, including Nantahala, to pass on to ratepayers the benefits of savings generated by the Tax Reform Act of 1986 did not violate Nantahala's equal protection rights because the local telephone operating companies were not required to pass on all of the tax savings to their ratepayers where the reasons given by the Commission for treating the local telephone operating companies differently from other utilities bears a rational relationship to a legitimate public interest.

**Am Jur 2d, Public Utilities §§ 177, 232, 240.**

3. **Utilities Commission § 24 (NCI3d) — tax savings — refund to ratepayers — no retroactive ratemaking**

Where a provisional order of the Utilities Commission required utilities to place in a deferred account beginning on a future date the excess tax revenues collected over what the utilities would have to pay in taxes as a result of savings generated by the Tax Reform Act of 1986, the Commission's final order requiring that the funds in the deferred account be refunded to the ratepayers did not constitute retroactive ratemaking.

**Am Jur 2d, Public Utilities §§ 177, 232, 240.**

ON appeal and discretionary review pursuant to N.C.G.S. § 7A-31 of the decision of the Court of Appeals, 92 N.C. App. 545, 375 S.E.2d 515 (1989), reversing orders of the Utilities Commission (Commission). Heard in the Supreme Court 14 November 1989.

*Lacy H. Thornburg, Attorney General, by Karen E. Long, Assistant Attorney General, for the Attorney General, appellant.*

*North Carolina Utilities Commission Executive Director Robert P. Gruber, by Chief Counsel, Antoinette R. Wike, and Staff Attorney, A. W. Turner, Jr., for Public Staff—North Carolina Utilities Commission, appellant.*

**STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.**

[326 N.C. 190 (1990)]

*Hunton & Williams, by Edward S. Finley, Jr., for Nantahala Power and Light Company, appellee.*

FRYE, Justice.

[1] The issue in this case is whether the Utilities Commission may pass on to the ratepayers the benefits of the Tax Reform Act of 1986 (TRA-86) through a rulemaking procedure rather than a ratemaking procedure. The Court of Appeals held "there is no authority either in our statutes or in the case law that allows rates to be adjusted by a rulemaking process." *Utilities Commission v. Nantahala Power and Light Company*, 92 N.C. App. 545, 553, 375 S.E.2d 515, 520 (1989). The Court of Appeals reversed the orders of the Utilities Commission as applied to Nantahala Power and Light Company (Nantahala). We now reverse the Court of Appeals and hold that the Commission properly ordered the affected utilities, through a rulemaking procedure, to lower their rates to reflect the savings generated by the TRA-86.

One effect of the TRA-86, which was signed by the President on 22 October 1986, was to lower corporate tax rates from 46% to 34% effective 1 July 1987. On 23 October 1986, the Commission issued Docket No. M-100, Sub 113, which was entitled Order Initiating Investigation. While the docket numbering designation given this order was that of a rulemaking action, the order itself did not specifically say that the Commission was instituting a rulemaking action. The order was provisional in nature, generally requiring the affected utilities to determine the savings generated by the TRA-86 and place this amount in a deferred account pending further orders of the Commission. In this order, the Commission noted:

> This reduced tax rate when effectuated will have an immediate and favorable impact on the cost of providing the aforementioned public utility services to consumers in North Carolina. It is incumbent upon this Commission to take the appropriate action as required so as to preserve and flow through to ratepayers, as a reduction to public utility rates, any and all cost savings realized in this regard which would otherwise accrue solely to the benefit of the companies' stockholders.

The Commission further explained that it "opens this docket to examine and quantify the benefits to be derived by each utility . . . arising from this tax reform," in part because of the applicability

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

of the TRA-86 to all the utilities and the short period of time remaining until it became effective.

The Commission then ordered:

1. That effective January 1, 1987, the federal income tax and the related gross receipts tax components of the rates and charges of all electric, telecommunications, and natural gas distribution companies and all water and sewer companies with annual operating revenues in excess of $250,000 subject to the jurisdiction of this Commission shall be, and hereby are, ordered to be billed and collected on a provisional rate basis pending final disposition of this matter.

2. That effective January 1, 1987, each and every utility subject to the provisions of this Order shall place in a deferred account the difference between revenues billed under rates then in effect, including provisional components thereof, and revenues that would have been billed had the Commission in determining the attendant cost of service based the federal income tax component thereof on the Internal Revenue Code as now amended by the Tax Reform Act of 1986, assuming all other parameters entering into the cost of service equation are held constant.

3. That each and every utility subject to the provisions of this Order shall determine the dollar amount of the impact of the Tax Reform Act of 1986 on its annual level of income tax expense included in its North Carolina jurisdictional cost of service consistent with ordering paragraph No. 2 above and file same with the Chief Clerk of the Commission no later than November 30, 1986. Said filing shall include all workpapers and a statement of all assumptions made in complying with the foregoing requirements. Further, each affected utility in conjunction with the foregoing shall file proposed rate adjustments giving effect to the reduction in its cost of service arising from the Tax Reform Act of 1986. The Commission will consider any additional information or comments any party may wish to offer.

On 10 November 1986, the Public Staff filed a motion recommending that each utility subject to the 23 October 1986 Order determine the dollar amount of impact which the TRA-86 had on it based on the test year for that utility as set in the utility's

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

last general rate case. The Commission adopted the Public Staff's motion in an Order Ruling On Motion issued 4 December 1986.

Nantahala filed a compliance with the Commission's order on 15 January 1987. In that filing, Nantahala stated that it "strenuously objects to a requirement that it flow through as an (sic) reduction in its rates any decrease in federal income tax expense arising from the Tax Reform Act of 1986." Nantahala based this objection on the fact that it was currently receiving only about an 8% rate of return while, in Nantahala's last general rate case, the Commission authorized it to collect a 12.52% rate of return. Nantahala contended that the rates should only be adjusted when all components of the cost of service were examined rather than be adjusted based on the decrease of an isolated component of cost of service such as this tax decrease. Nantahala urged the Commission not to flow through the savings from this tax decrease unless it examined whether this decrease was offset by other items in the cost of service and whether the overall cost of service had actually decreased.

The Commission filed a final order on 20 October 1987, and this order was amended by an Order Modifying Order of October 20, 1987. The final effect of these two orders was that Nantahala and the other affected utilities had to calculate "[t]he rate reductions related to the tax savings from TRA-86" and "file only one set of tariffs in this docket decreasing rates effective January 1, 1988, to reflect the 34% federal corporate income tax rate." Two Commissioners dissented from the order of 20 October 1987. Commissioner Tate stated that our statutes only allow rates to be set in general rate cases or in complaint cases. She explained that this procedure was neither a rate case nor a complaint case, and yet it decreased rates. Commissioner Cook concurred in the part of the order which affected Nantahala and dissented from the portion of the Order which flowed through less than 100% of the tax savings to the telephone subscribers.

Some utilities were not affected by this final order because they had either voluntarily complied with the order or were currently involved in rate cases. The telephone companies as a group were allowed to offset part of their savings with revenue reductions previously ordered by the Commission, and, therefore, they were not affected by this final order. Water and sewer companies were likewise, as a group, treated differently from the rest of the utilities

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

in this order. Of all the utilities affected by the final order, only Nantahala appealed the Commission's action to the Court of Appeals.

The Court of Appeals reversed the orders of the Utilities Commission as applied to Nantahala. The Public Staff and the Attorney General both filed petitions with this Court for discretionary review of the opinion of the Court of Appeals, and these petitions were allowed on 5 April 1989. We now determine whether there is error in the decision of the Court of Appeals.

The Court of Appeals concluded that the Commission should have handled this matter in accordance with N.C.G.S. § 62-133, § 62-136, or § 62-137 which are the statutes setting out the procedures used in general rate cases or complaint proceedings. *Utilities Commission v. Nantahala Power and Light Company*, 92 N.C. App. at 551, 375 S.E.2d at 520. The court noted that the Public Staff and Attorney General contended that the adjustment of the rates in this case can be carried out by rulemaking as authorized by N.C.G.S. § 62-31. *Id.* The court then distinguished this Court's holding in *Utilities Commission v. Edmisten, Attorney General*, 294 N.C. 598, 242 S.E.2d 862 (1978) (*Edmisten III*), which the Public Staff and Attorney General used to support the Commission's actions. *Utilities Commission v. Nantahala Power and Light Company*, 92 N.C. App. at 551-53, 375 S.E.2d at 518-19. We conclude that the Court of Appeals interpreted the utility statutes and *Edmisten III* too narrowly and that *Edmisten III* does provide authority for changing rates in rulemaking proceedings in special circumstances such as in this case.

Chapter 62 of our General Statutes is entitled "Public Utilities" and sets out the organization and the operating procedures of the Utilities Commission. N.C.G.S. § 62-23 is entitled "Commission as an administrative board or agency." This statute provides in part:

This Commission is hereby declared to be an administrative board or agency of the General Assembly created for the principal purpose of carrying out the administration and enforcement of this Chapter, and for the *promulgation of rules and regulations* and fixing utility rates pursuant to such administration . . . . The Commission shall separate its administrative or executive functions, its rule making functions, and its functions judicial in nature to such extent as it deems practical and advisable in the public interest.

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

N.C.G.S. § 62-23 (1989) (emphasis added). The general powers of the Utilities Commission are set out in N.C.G.S. § 62-30: "The Commission shall have and exercise such general power and authority to supervise and control the public utilities of the State as may be necessary to carry out the laws providing for their regulation and all such other powers and duties as may be necessary or incident to the proper discharge of its duties." N.C.G.S. § 62-30 (1989).

N.C.G.S. § 62-31 is even more explicit in granting rulemaking authority to the Commission. This statute provides: "The Commission shall have and exercise full power and authority to administer and enforce the provisions of this Chapter, and to *make and enforce reasonable and necessary rules and regulations to that end.*" N.C.G.S. § 62-31 (1989) (emphasis added). These statutes clearly authorize the Utilities Commission to promulgate rules for the utilities which it regulates. N.C.G.S. § 62-2 further defines the policy which the Commission is to carry out through the exercise of this power. In a list of eight policies of the Utilities Commission found in that statute, number one is "[t]o provide fair regulation of public utilities in the interest of the public." N.C.G.S. § 62-2(1) (1989).

While the Court of Appeals did not question the Commission's general rulemaking authority, the court concluded that, as it interpreted our statutes, rates could not be changed through a rulemaking procedure. We find the authority for the Commission to use its rulemaking power in this case in the statutes cited above and in this Court's approval of the rulemaking procedure used in *Edmisten III*. In *Edmisten III*, this Court upheld the Commission's order promulgating a rule which allowed natural gas companies to participate in exploration and drilling programs to find new sources of natural gas. The companies would then make application for rate adjustments to allow recovery of the costs of these programs. *Edmisten III*, 294 N.C. at 601, 242 S.E.2d at 865. This Court held that the Commission did not err in failing to declare this proceeding to be a general rate case and in failing to allow rate hearings. *Id.* at 608, 242 S.E.2d at 868-69.

The Court of Appeals distinguished *Edmisten III* in three ways. *Utilities Commission v. Nantahala Power and Light Company*, 92 N.C. App. at 553, 375 S.E.2d at 519. These distinctions, however, are not sufficient to distinguish the present case from *Edmisten III* and to support a holding that rates cannot be changed in rulemaking procedures under the proper circumstances.

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

The first distinction which the Court of Appeals made was that the original intent of the Commission in its rulemaking procedure in *Edmisten III* was not to raise the rates, but to study "the feasibility of increasing the supplies of natural gas to North Carolina." *Id.* (quoting *Edmisten III*, 294 N.C. at 600, 242 S.E.2d at 864). The court found that this was a distinction between *Edmisten III* and the present case because the stated purpose of the Commission in the present case was to lower rates. *Utilities Commission v. Nantahala Power and Light Company*, 92 N.C. App. at 553, 375 S.E.2d at 519. We do not find this to be a legitimate distinction. While the purpose of the Commission in *Edmisten III* was to increase the supply of natural gas to North Carolina, the ultimate effect was to raise the rates paid by the ratepayers to the extent necessary to pay for the added cost of exploration for natural gas. The purpose of the proceeding in the present case was not to set rates but to take the effect of the reduction in tax rates and flow it through to the ratepayers. Likewise, the proceeding in *Edmisten III* was not to set rates but to pass on to the ratepayers the actual cost of finding new supplies of natural gas which were needed in North Carolina. The difference in the stated purpose does not require a different result in these two cases.

The Court of Appeals also concluded that *Edmisten III* is different from the present case because the final outcome of the hearings in *Edmisten III* was the promulgation of a "rule." *Id.* While in the present case the Commission did not call its final order a "rule," all parties involved in the proceedings had proper notice that the Commission was engaging in a rulemaking proceeding. The procedure used by the Commission was clearly rulemaking procedure, and the docket number given to the proceedings was that of a rulemaking docket. Nantahala does not contend that it was not properly notified of the nature of the proceeding; its argument was that the wrong type of procedure was being instituted. The failure to formally call the procedure a rulemaking procedure in the body of the order and the failure to label a portion of the final order a "rule" do not change the Commission's actions from that of rulemaking, particularly in view of the fact that all the parties seemed to be well informed as to what the Commission was doing.

The Court of Appeals finally distinguished *Edmisten III* from the present case because *Edmisten III* provided for a possible increase or decrease in rates while the present case provides only

198 IN THE SUPREME COURT

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

for a decrease. *Id. Edmisten III* permitted recovery of the costs of Commission-approved projects, limited "to the amount by which reasonable costs of the programs exceeded revenues received from them." 294 N.C. at 604, 242 S.E.2d at 866. In the event that revenues exceeded reasonable costs, rates would be adjusted downward by an amount sufficient to amortize the excess revenues over a specified period. *Id.* The Court of Appeals noted that in the present case the Commission promulgated no corresponding rule which would allow the utilities to raise rates if taxes were raised. Again we conclude that this distinction does not require a different result between *Edmisten III* and the present case. In *Edmisten III*, the approved exploratory activity itself could result in either revenues exceeding expenses or expenses exceeding revenues, thus requiring a rule to provide for either contingency. In the present case, the only matter before the Commission was a tax decrease. Whether Congress might at some time in the future enact a substantial increase in taxes is too speculative and tenuous to require the attention of the Commission in this proceeding. Should corporate tax rates be increased so that they uniformly and substantially increase taxes for utilities in the same manner as taxes were decreased by the TRA-86, the Commission could, on its own initiative, as it did here, or at the urging of the utilities it regulates, as in *Edmisten III*, determine in a rulemaking proceeding whether and to what extent rates should be increased to offset the increase in taxes.

The Court of Appeals cited extensively from Commissioner Tate's dissent to the Commission's order of 20 October 1987. That dissent cited *North Carolina Utilities Commission v. Edmisten* (*Edmisten II*). The dissent included the following language from that case:

> If by virtue of some change in the tax law, it develops that the company did not incur the anticipated expense for the payment of which it collected revenues in prior months, its rates for present and future service may not be cut, on that account, below what it otherwise would be entitled to charge for the present or future service.

*Edmisten II*, 291 N.C. 451, 469, 232 S.E.2d 184, 194-95 (1977). The quote from *Edmisten II* is inapplicable to the present case. In *Edmisten II* the Commission authorized the utility to add a surcharge to the rates of its present and future customers which

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

the majority of the Court concluded was to cover excess fuel costs incurred in providing service to customers in two prior months. While disagreeing with the Attorney General that this was retroactive ratemaking, the majority of the Court, nevertheless, held that the Commission had no authority to add this surcharge for past excess fuel costs. After explaining the basic theory of utility ratemaking, Justice Lake, writing for the majority, used the above-quoted language to illustrate an accepted rule. The rule is that a utility may not be denied the right to charge a *current* rate sufficient to recover its *current* cost plus a fair return on its used and useful property for the reason that, in a *previous* period, its cost of service was less because it did not incur an expected expense, i.e., taxes.

In the present case, the Commission's orders do not change current or future rates based on costs of service for previous months. Rather, the orders relate to rates for the same periods covered by the tax decrease. The Commission wisely took immediate action, filing the original order just one day after the TRA-86 was signed into law and prior to the effective date of the tax reductions. The Commission on 23 October 1986 ordered the utilities to place in a deferred account, beginning 1 January 1987, the difference between revenues billed under the old rates and revenues which would be billed after the tax reduction went into effect. The 1987 order simply disposed of those funds by requiring that they be refunded to the customers. The Commission's order here was prospective rather than retroactive. Therefore, assuming the correctness of the language in *Edmisten II* concerning revenues collected in prior months for nonincurred expenses, it does not apply here.

While we conclude that *Edmisten III*, rather than *Edmisten II*, is controlling on the authority of the Commission to alter rates in a rulemaking proceeding, our conclusion finds further support in the decisions of the United States Supreme Court and in scholarly discourses on administrative law. As stated earlier, the real issue here is whether rates can be changed in a rulemaking procedure under the statutes which govern the workings of the Commission or whether the Commission must hold full-fledged general rate hearings or more limited complaint proceedings every time a rate is altered regardless of the circumstances necessitating the change. While the Commission is not covered by our Administrative Procedure Act found in N.C.G.S. Chapter 150B ["The following are specifically exempted from the provisions of this Chapter . . . the Utilities Commission." N.C.G.S. § 150B-1 (Cum. Supp. 1989)],

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

the Commission is still an administrative agency of the state government, and general tenets of administrative law are applicable to its operation except where modified by statute. Several United States Supreme Court cases and numerous scholarly works have addressed the difference in rulemaking procedures, such as those in the present case, and adjudicatory procedures, such as general rate cases and complaint cases, and when an individual hearing is necessary. *E.g., United States v. Florida East Coast Railway Company,* 410 U.S. 224, 35 L. Ed. 2d 223 (1973); *Bi-Metallic Investment Company v. State Board of Equalization,* 239 U.S. 441, 60 L. Ed. 372 (1915); Bonfield, *State Administrative Rule Making* (1986); K. Davis, *Administrative Law Treatise* (2d ed. 1979); Daye, *North Carolina's New Administrative Procedure Act: An Interpretive Analysis,* 53 N.C. L. Rev. 833 (1975); and R. Pierce, S. Shapiro & P. Virkuil, *Administrative Law and Process* (1985). While the cases cited above are not binding precedent for our case, the analysis of the difference in rulemaking and adjudicatory procedures and when a hearing is necessary is directly applicable to the present case.

In *Florida East Coast,* two railroad companies brought an action to set aside rates established by the Interstate Commerce Commission in a rulemaking proceeding. *United States v. Florida East Coast Railway Company,* 410 U.S. at 225, 35 L. Ed. 2d at 227. The facts of *Florida East Coast* are very similar to those in the present case. The railroad companies argued that the rates could not be changed in a rulemaking proceeding, but rather required a full oral hearing much like our general rate case hearings. *Id.* at 234, 35 L. Ed. 2d at 223. The United States Supreme Court held that a full oral hearing was not necessary. *Id.* at 246, 35 L. Ed. 2d at 239. After reviewing several of its own decisions, the Court drew the conclusion that "these decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other hand." *Id.* at 245, 35 L. Ed. 2d at 239. The Court further noted that the final orders which the Interstate Commerce Commission adopted were "applicable across the board to all of the common carriers." *Id.* at 246, 35 L. Ed. 2d at 239. The Court also concluded that while the Interstate Commerce Commission relied on factual inferences on which to base its order, "[t]he factual inferences were used in the formulation of a basically legislative-type judgment, for prospective application

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

only, rather than in adjudicating a particular set of disputed facts." *Id.* at 246, 35 L. Ed. 2d at 240. In evaluating the holding of *Florida East Coast* as applied to the present case, a full rate hearing or even a complaint hearing is not necessary when the rule promulgated applies uniformly to all utilities which are similarly affected and no adjudicative-type facts need to be decided even though rates may be changed.

In his article on the North Carolina Administrative Procedure Act, Professor Daye distinguished adjudication from rulemaking as follows:

> The touchstone for distinguishing adjudication from rulemaking is that adjudication involves a specifically named party and a determination of particularized legal issues and facts with respect to that party. Rulemaking, by contrast, involves general categories or classes of parties and facts and policies of general applicability.

Daye, 53 N.C. L. Rev. at 868. When considering this definition, the holding in *Florida East Coast*, and the facts of this case, we conclude that the only facts involved in this case were legislative facts. The order by the Commission in the present case did not involve any facts which were in dispute. The corporate tax rate had been lowered by the TRA-86, and, consequently, the ratepayers would be overpaying if their rates were set so that the utilities could recover taxes at the higher rate which was in effect before the reduction. These facts are legislative facts, not adjudicative facts, and are applied uniformly to all of the utilities affected by the order. These facts are the type which are appropriately handled in a rulemaking-type proceeding. The facts which Nantahala contends are in dispute, mainly the fact that Nantahala is currently collecting a rate of return which is less than that which it was allowed to collect as a result of its last general rate hearing, pertain to Nantahala alone and not to the other utilities affected by this order. Moreover, the fact that Nantahala is currently collecting a rate of return less than that previously authorized by the Commission has nothing to do with the change in the tax laws. Nantahala's failure to realize its allowed rate of return was a problem for Nantahala before the TRA-86 was enacted. Therefore, the facts which Nantahala claims should prevent it from having to follow the Commission's order are adjudicative-type facts which should

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

be decided in an individualized proceeding such as a complaint hearing or a general rate case.

The procedure used by the Commission was very similar to that used by the Federal Energy Regulatory Commission (FERC) as it was faced with the identical situation when the TRA-86 went into effect. FERC issued a Notice of Proposed Rulemaking in Docket No. RM87-4-000 on 12 March 1987 and later codified as Order 475. Conservation of Power, Water Resources, 18 C.F.R. § 35.27 (1989). This Notice and the Order applied only to electric utilities even though the TRA-86 applied uniformly to all utilities. The Rule did not apply to natural gas pipeline companies because they already had tax trackers included in their rate settlements, and FERC decided to deal with oil pipeline rates on a case-by-case basis. In discussing why it was using this approach, FERC explained in the Notice that the last corporate income tax reduction had been in 1978 when the rates were decreased from 48% to 46%. At that time FERC did not issue a statement of policy or a final rule. It merely considered this tax rate change on a case-by-case basis. The Commission explained that the situation is different in this case because the TRA-86 represents a dramatic decrease in the corporate income tax rates. As did our Commission, FERC saw the need to respond quickly to this change in the tax rates. In its Notice, FERC stated:

> The Commission believes that the Federal corporate income tax rate decrease mandated by the Tax Reform Act of 1986 may result in significant overcollections by a public utility after July 1, 1987, if the public utility fails to adjust its rates to reflect this decrease. For this reason, the Commission is proposing to institute a procedure to encourage public utilities to voluntarily file rate reductions with the Commission . . . .

52 Fed. Reg. 8616, 8618 (1987).[1]

The Iowa Utility Board handled the effect of the TRA-86 in much the same way as our Commission. The Board passed a rule which instructed utilities which were not currently involved in pending contested cases to lower their rates to reflect the changes

---

1. Nantahala argues that the North Carolina Utilities Commission should have made compliance voluntary rather than mandatory. While the Commission could have sought voluntary compliance with the TRA-86, it clearly was authorized to make compliance mandatory. We note from the record that most of the other utilities voluntarily reduced their rates to reflect the savings generated by the TRA-86.

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

caused by the TRA-86 and ordered those utilities with pending contested cases to do the same thing. *Iowa Electric Light & Power v. Utilities Board*, 442 N.W.2d 99, 100 (Iowa 1989). The issue in that case involved whether the Board could treat the two groups of utilities differently and use different data from the companies to determine what reduction the utilities should pass on to the ratepayers. *Id.* The Court held that there was a reasonable basis for treating the groups differently. The reasonable basis was in part due to the need to act quickly so that the savings could be passed on quickly to the ratepayers. *Id.* The Iowa Supreme Court held that it was proper for the Board to promulgate a rule implementing the rate reductions for those utilities which were not involved in a rate case and to order the utilities which were involved in current rate cases to lower their rates to reflect the savings brought on by the TRA-86. *Id.* at 101. In so holding, the Court concluded, "The choice of whether to develop a policy by rule, contested case, or both, rests within the informed discretion of the administrative agency." *Id.*

From a review of our holding in *Edmisten III*, the holding in *Florida East Coast*, the guidance found in scholarly works, and the actions of other agencies dealing with the same issue, we conclude that the Commission was acting within its authority when it ordered the affected utilities, including Nantahala, to determine the amount of savings resulting from the TRA-86 and to pass these savings on to the ratepayers. The Commission properly formulated a rule which applied uniformly to the affected utilities which were similarly situated. The circumstances surrounding this procedure made it appropriate for the Commission to use a rulemaking procedure because: 1) the tax reduction affected all utilities uniformly; 2) a large number of utilities were affected, making individual hearings for all inappropriate; and 3) no adjudicative-type facts were in dispute so as to require a trial-type hearing for each individual utility.

[2] In this appeal, Nantahala argues two other issues which the Court of Appeals did not reach. These issues are: 1) whether the Commission's actions violated Nantahala's equal protection rights because some utilities, primarily the local telephone operating companies, were not required to pass on all of the tax savings to their ratepayers; and 2) whether the refund order by the Commission constituted retroactive ratemaking. We conclude that neither of these issues has merit.

STATE EX REL. UTILITIES COMM. v. NANTAHALA POWER AND LIGHT CO.

[326 N.C. 190 (1990)]

As mentioned above, the local telephone operating companies were allowed, as a group, to offset part of their tax savings with revenue reductions previously ordered by the Commission. Nantahala contends that it too had non-tax offsets which the Commission should have recognized just as it did for the telephone companies. We see no violation of equal protection on the part of the Commission in excluding these groups from the order.

The Commission fully discussed in its order of 20 October 1987 its reasons for excluding the local telephone exchanges from that order. The Commission pointed out that, while the Public Staff and the Attorney General both proposed that the local telephone operating companies be included in the order, it found to do so would be impractical. The Commission stated:

> The impracticality of following this proposal is that there are numerous local telephone operating companies in North Carolina and the circumstances are different for many of them. To require the flow through of the federal tax savings without allowing an offset for these access charge reductions ordered by the Commission would likely place some LEC's in a position of having to immediately file for rate increases. Therefore, subscribers of these affected telephone companies could experience a decrease and then an increase in their local rates. Such up and down effects on rates disrupt reasonable budgeting practices by both homes and businesses and should be avoided if the net gain to the customers is not significant.

While the local telephone operating companies were singled out as a group for different treatment, there were factors surrounding this group, which the Commission made clear in its orders, that made them subject to different treatment from the electric utilities. Nantahala argues that the Commission's distinctions were arbitrary and not rationally related to a legitimate governmental interest. We conclude that the reasons given by the Commission for treating the local telephone operating companies differently from the other utilities bears a rational relationship to a legitimate public interest. That is all that is necessary to satisfy the requirements for equal protection in the area of economic regulation. *New Orleans v. Dukes*, 427 U.S. 297, 49 L. Ed. 2d 511 (1976).

[3] Nantahala's argument that the Commission's final order requiring Nantahala to refund a portion of previously collected revenues constitutes retroactive ratemaking likewise has no merit. What

Nantahala is referring to is the portion of the final order which instructs the affected utilities to refund a part of the provisional rates, which were an overcollection of taxes, collected between 1 January 1987 and 20 October 1987 when the final order was issued.

Retroactive ratemaking has been defined as "[a]djustments to future rates to rectify undue past profits . . . ." *Madison Gas & Electric v. Public Service Commission*, 150 Wis. 2d 186, 195, 441 N.W.2d 311, 316 (1989). It has also been defined as occurring "when an additional charge is made for past use of utility service, or the utility is required to refund revenues collected, pursuant to then lawfully established rates, for such past use." *State ex rel. Utilities Commission v. N.C. Natural Gas Corp.*, 323 N.C. 630, 641, 375 S.E.2d 147, 153 (1989) (quoting *Edmisten II* at 468, 232 S.E.2d at 194). The final order in this case does not fit either definition. In the provisional order of 23 October 1986, the Commission ordered the utilities to place in a deferred account beginning on 1 January 1987 the excess tax revenues collected over what the utility would have to pay in taxes as a result of the savings generated by the TRA-86. The 29 October 1987 order simply provided that the funds in the deferred account be refunded to the ratepayers. This does not constitute "adjustments to future rates to rectify undue past profits," and this is not retroactive ratemaking as defined by *Edmisten II*. See *State ex rel. Utilities Commission v. C.F. Industries, Inc.*, 299 N.C. 504, 263 S.E.2d 559 (1980).

The decision of the Court of Appeals is reversed and the orders of the Commission as applied to Nantahala are reinstated.

Reversed.