1998 ME 218

**PUBLIC ADVOCATE**

v.

**PUBLIC UTILITIES COMMISSION
et al.**

Supreme Judicial Court of Maine.

Argued Jan. 6, 1998.
Decided Sept. 28, 1998.

Wayne R. Jortner (orally), Stephen G. Ward, Public Advocate Office, Augusta, for appellant.

Peter G. Ballou (orally), Gilbert W. Brewer, Joanne B. Steneck, Public Utilities Commission, Augusta, for appellees.

Gerald M. Amero (orally), William D. Hewitt, Pierce Atwood, Portland, and Donald W. Boecke, New England Tel. & Tel. Co., Boston, MA, for Bell Atlantic.

Before WATHEN, C.J., CLIFFORD, RUDMAN, LIPEZ * and SAUFLEY, JJ., and ROBERTS, A.R.J.**

CLIFFORD, Justice.

[¶ 1] The Public Advocate appeals an order entered by the Public Utilities Commission, and the denial of a motion to reconsider that order, allowing New England Telephone and Telegraph Company (NET)[1] to recover, through a surcharge in rates, costs related to an expansion of basic service calling areas mandated by the Commission. The Public Advocate contends that the Commission's order allowing the surcharges is beyond the Commission's statutory authority and constitutes impermissible retroactive ratemaking. We disagree that the surcharge is retroactive ratemaking and conclude that the order implementing the Commission's mandate was a legitimate deferral of collection of unusual costs to a time when those costs were known, pursuant to 35–A M.R.S.A. § 502(1) (1988). Accordingly, we affirm.

[¶ 2] At issue in this appeal is M.P.U.C. Reg. 65–407, Chapter 204, the Basic Service Calling Area (BSCA) rule. In 1994 the Commission implemented the BSCA rule to expand basic service calling areas (within which calls are local and not subject to a long distance toll charge) of the telephone companies.

[¶ 3] The BSCA rule was certain to affect telephone company revenues. The nature of that effect, however, was difficult to predict. Rather than attempt to determine that effect *in advance* and authorize rate changes, surcharges or refunds, *before* the effective date of the changes in the basic service calling areas, (rate changes that were almost certain not to accurately reflect the true cost), the Commission adopted a deferred accounting mechanism so that the cost of the BSCA rule could be accurately determined before changes in the rates necessary to cover the cost of those changes were approved. Chapter 204 required each local exchange carrier (LEC)[2] to establish a "tracking account" to record the revenue effects of the BSCA plan for the first twelve months after the plans are implemented. The rule then required the LEC to file a report with the Commission:

> If the tracking account has a positive balance, the LEC must file a proposal to return the excess to customers and to lower prospective rates with its report. If the tracking account has a negative balance, the LEC may file proposed rates for Commission review and approval to recover the shortfall that occurred during the 12–month deferral period and the period following the 12–month deferral period but prior to the effective date of the newly proposed rates, and to adjust prospective rates to avoid a similar revenue shortfall in the future.

Chapter 204(VII)(A)(3). Chapter 204 further stipulated that any proposed rate increase based on the BSCA rule would be "revenue neutral," i.e., the utility is prohibited from taking in more revenue than the documented cost of the expanded service required by the rule. The rate of return of the utility would not be affected.

[¶ 4] NET added new exchanges pursuant to the BSCA rule in March of 1995,

---

* Lipez, J., sat at oral argument and participated in the initial conference but resigned before this opinion was adopted.

** Justice Roberts sat at oral argument and participated in the initial conference while he was a Justice, on order of the Chief Justice, was authorized to continue his participation in his capacity of Active Retired Justice.

1. At the time of the order NET was doing business as NYNEX but will be referred to as NET.

2. An LEC is a telephone utility that provides basic service and interconnects directly with customers' telephones in a least one Maine exchange. NET is an LEC.

several months prior to the conclusion of a NET rate case. That rate case, however, did not consider the revenue effect of the BSCA rule. NET filed its tracking report on December 6, 1996. The tracking report reflected that the implementation of the additional basic service calling areas resulted in one time implementation costs of $501,655 and a revenue shortfall of about $3 million per year. NET filed to recover the shortfalls incurred as a result of compliance with Chapter 204, as authorized by the rule. The Commission approved the recovery in an order dated April 15, 1997 for: (1) one-time implementation costs of $501,655; (2) the revenue shortfall of $6 million that occurred over the two years between implementation of additional calling areas and the date of the order (March 1, 1995 to April 15, 1997); and (3) an ongoing projected annual revenue shortfall of $2,987,484. After the Commission denied a motion by the Advocate to modify the order allowing the surcharges,[3] the Public Advocate brought this appeal pursuant to 35–A M.R.S.A. § 1320, challenging, as prohibited retroactive ratemaking, the approval of NET's request for recovery of $6 million in past revenue shortfall and $501,655 in one-time implementation costs. The Public Advocate does not challenge the portion of the order allowing recovery, through an increase in basic telephone rates, of the *ongoing* projected $3,000,000 shortfall in revenue caused by the BSCA implementation, that order having no retroactive aspects.

 [¶ 5] Our review of the actions of the Commission is limited. "We defer to the Commission's choice of ratemaking methodologies or techniques." *Public Advocate v. Public Utils. Comm'n,* 655 A.2d 1251, 1253 (Me.1995) (citing *New England Tel. & Tel. Co. v. Public Utils. Comm'n,* 448 A.2d 272, 279 (Me.1982)). We review questions of law *de novo,* but "[o]n questions involving the interpretation and application of technical statutes or regulations, we give deference to the administrative agency unless the statutes or regulations plainly compel a contrary result." *National Indus. Constructors, Inc. v. Superintendent of Ins.,* 655 A.2d 342, 345 (Me.1995); *see also Agro v. Public Utils. Comm'n,* 611 A.2d 566, 569 (Me.1992) ("a court will defer to an administrative agency's construction of a statute administered by it").

### THE RATEMAKING PROCESS.

 [¶ 6] The purpose of Maine's public utilities regulatory system "is to assure safe, reasonable and adequate service at rates which are just and reasonable to customers and public utilities." 35–A M.R.S.A. § 101 (1988). In the usual proceedings for approval of schedules for prospective rate increases pursuant to 35–A M.R.S.A. §§ 301–312 (1988 & Supp.1997), the Commission has the power to approve rates which are "just and reasonable," and "[e]very unjust or unreasonable charge for public utility service is prohibited and declared unlawful." 35–A M.R.S.A. § 301(3), (4) (1988 & Supp.1997). The statute is explicit that "[i]n determining just and reasonable rates," the commission:

> A. Shall provide such revenues to the utility as may be required to perform its public service and to attract necessary capital on just and reasonable terms; and …
>
> B. Shall, to a level within the Commission's discretion, consider whether the utility is operating as efficiently as possible and is utilizing sound management practices ….

35–A M.R.S.A. § 301(4) (1988 & Supp.1997). The just and reasonable rate is determined by the Commission "after consideration of the utility's appropriate rate of return, 'designed to provide sufficient revenue to cover the Company's total cost of service. Such

---

3. In its order denying the motion to modify, the Commission stated that its April 5th decision was:

> no more than the Commission's exercise of its well-settled authority to adjust the timing of the recovery of costs and the receipt of revenues where the public interest so requires…. We do not consider that Chapter 204, Part VII, § A has implemented a form of retroactive ratemaking, but instead is an exercise of the Commission's power, incident to its normal ratemaking power, to permit or require shifts in timing for the recovery of costs or revenue shortfalls.

The Commission also noted that the Public Advocate did not raise the retroactive ratemaking issue throughout the entire two-year period when NET was collecting data pursuant to the BSCA tracking provision in reliance upon the rule.

costs include both the operating expenses of the utility and an adequate return on the investment in property and equipment serving the public.'" *Maine Pub. Advocate v. Public Utils. Comm'n,* 476 A.2d 178, 179 (Me.1984) (quoting *Central Me. Power Co. v. Pub. Utils. Comm'n,* 455 A.2d 34, 38 (Me. 1983)); *see also Camden & Rockland Water Co. v. Maine Pub. Utils. Comm'n,* 432 A.2d 1284, 1286 (Me.1981).

## PROHIBITIONS ON RETROACTIVE RATEMAKING

[¶ 7] The Public Advocate contends that prior case law clearly establishes that the Commission lacks authority to adjust rates pursuant to the tracking mechanism. He relies on four of our prior cases: *New England Tel. & Tel. Co. v. Public Utils. Comm'n,* 354 A.2d 753 (Me.1976) (hereinafter *NET I* ); *New England Tel. & Tel. Co. v. Public Utils. Comm'n,* 362 A.2d 741 (Me.1976) (*NET II* ); *First Hartford Corp. v. Central Me. Power Co.,* 425 A.2d 174 (Me.1981); *Maine Pub. Advocate v. Public Utils. Comm'n,* 476 A.2d 178 (Me.1984). The prohibition on retroactive ratemaking is not unique to Maine. It has been summarized as follows:

> The rule prohibits a public utility commission from setting future rates to allow a utility to recoup past losses or to refund to consumers excess utility profits. Restated, the rule prohibits a utility commission from making a retrospective inquiry to determine whether a prior rate was reasonable and imposing a surcharge when rates were too low or a refund when rates were too high.

*State v. Public Util. Comm'n of Texas,* 883 S.W.2d 190, 199 (Tex.1994) (citation omitted).

[¶ 8] Our cases are consistent with the rule articulated by the Texas court in that they make clear that the Commission has no authority to approve changes in rates that compensate a utility after the fact for errors in rates previously determined to be just and reasonable. *See NET II,* 362 A.2d at 758; *see also First Hartford Corp.,* 425 A.2d at 181. Once rates have been set, the Commission may not adjust those rates retrospectively to make up for subsequently discovered mistakes in those rates. *See*

*NET II* at 758; *see also First Hartford Corp.,* 425 A.2d at 181. The Public Advocate argues that the language in those cases makes clear that the action of the Commission in adjusting the rates to implement the BSCA rule is impermissible retroactive ratemaking and beyond its power.

[¶ 9] In *NET I* we upheld the Commission's denial of NET's request, pending the outcome of a rate case, for a temporary rate increase for the period between the temporary request and the Commission's final approval of the increase in the underlying rate case. We held that this "regulatory lag" to the detriment of the utility could only be dealt with prospectively. *NET I,* 354 A.2d at 764. We concluded that the statutes did not give the Commission the authority to establish "temporary" rates as a means of providing an *after the fact remedy* for an entirely past situation no longer continuing at the time the Commission establishes the "temporary rates." *Id.* The BSCA tracking provision rule, however, is not an after the fact remedy. It reflects a decision by the Commission made *before* the costs of implementing the BSCA rule are incurred, and before they are known, to defer those costs to a time when the actual costs become known. Moreover, Chapter 204's tracking provision operates independently from ratemaking. NET's loss of revenue results from a mandate imposed by the Commission *subsequent* to the setting of rates.

[¶ 10] In *NET II* we considered whether the Commission could, pending the appointment of a third commissioner, grant a temporary rate increase subject to a refund or surcharge. *See NET II,* 362 A.2d at 747–49. The temporary rate was to yield $9.5 million in additional revenue for NET, was to be in effect until the full Commission issued an order determining NET's revenue requirements and establishing the permanent rate, and was conditioned on a refund being made or surcharge being collected at a later time once the revenue requirements were established. *See NET II,* 362 A.2d at 749–50, 753. Both NET and the Commission contended that the Commission had the authority to authorize such conditional rates. *See NET*

*II,* 362 A.2d at 753 & n. 17. We concluded otherwise.

[¶ 11] We said that the statute[4] that grants the Commission power to establish a just and reasonable rate if it finds an existing rate to be unjust or unreasonable does not enable the Commission to attach to a rate special conditions that the utility would not have been authorized to include in the first instance. We concluded that the statute did not give to the Commission express or implied "authority for the *enactment of a rate* subject to refund or surcharge." *Id.* at 754 (emphasis added).

[¶ 12] We looked to the "philosophy embodied in our utilities statute" and noted that what the legislature withheld from the Commission is the authority to approve a refund or surcharge, the purpose of which is to allow the Commission to determine after the fact that a rate was, *when charged,* too high or too low, and to adjust the rate by refund or discharge. *Id.* at 757. (emphasis added).

[¶ 13] The action taken by the Commission pursuant to Chapter 204 is not within the purview of *NET II.* The implementation of the BSCA rule and its tracking provision is not the enactment of a rate subject to a surcharge. Chapter 204 does not implicate NET's earnings, and prohibits any change in NET's rate of return from an increase in its net income that may result. The tracking provision is not a determination that the rates in effect during the tracking period were unjust or unreasonable, nor does Chapter 204 depend on a later determination of what constitutes just and reasonable rates. The rates in effect at the time of the implementation of the rule already determined the utility's return on its investment entirely independent from, and without regard to, the expansion of the basic service calling areas.

[¶ 14] The decision to implement the BSCA tracking provision was made *prior* to the time the new basic service calling areas went into effect. The costs of implementing the system could not be determined until the end of the tracking period. The tracking provision defers the recovery of those costs (or potentially, the savings) to a time when they become known.

[¶ 15] Nor does our decision in *First Hartford Corp. v. Central Me. Power Co.,* 425 A.2d 174, prohibit the Commission's action in this case. In *First Hartford* we affirmed the Commission's determination that it had no authority to grant retrospective rate relief to CMP's customers for amounts collected pursuant to fuel adjustment clauses when those clauses were no longer in effect. The fuel rates were fixed for a definite billing period, and the rates so fixed were "deemed just and reasonable" for that billing period. *Id.* at 179 (quoting *Central Me. Power Co. v. Public Utils. Comm'n,* 414 A.2d 1217, 1226 (Me. 1980)). We concluded that the Commission did not have the power "to order rebates to customers if the application of CMP's former fuel rates should result in excessive charges." *Id.* at 180. We said that the Commission has no power to revise rates retroactively, and that the "time for challenging a fuel adjustment rate is before the rate is approved by the Commission." *Id.* at 181.

[¶ 16] Unlike the circumstances in the *First Hartford* case, the costs of implementing the expansion of basic service calling areas were not considered and not factored into the rates then in effect. The BSCA tracking provision rule was implemented subsequent to the setting of NET's rates. The order allowing NET to recover costs pursuant to the BSCA rule, therefore, does not constitute a correction of past rates on the basis that such rates were unjust or unreasonable. Rather the impossibility of estimating the costs of implementing the BSCA rule in advance of the tracking period was recognized by the Commission and the costs appropriately deferred to a time when they were precisely known.

---

4. Title 35 M.R.S.A. § 294 (now 35–A M.R.S.A. § 1306) provided in relevant part:

If upon such formal public hearing the rates, tolls, charges, schedules or Joint rates shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in vio-

lation of chapters 1 to 17, the commission shall have power to fix and order substituted therefor such rate or rates, tolls, charges or schedules *as shall be just or reasonable.* . . .

The current provision closely tracks former § 294.

[¶ 17] Prior to deciding *Maine Pub. Advocate v. Public Utils. Comm'n*, 476 A.2d 178, we had determined that in calculating CMP's fuel cost adjustment[5] the Commission had erroneously factored in certain of CMP's statutorily provided saving shares earned by CMP through sales to other utilities. This resulted in lower fuel cost adjustments and effectively prevented the utility from collecting $5.7 million from its customers in fuel adjustments to which it was entitled. The Commission had removed these saving shares from the revenues in CMP's base rate calculation because they were being factored into rates as a reduction in fuel costs. *See Central Me. Power Co. v. Public Utils. Comm'n*, 458 A.2d 739, 741 (Me.1983) (The "[l]egislature did not intend to include sales-related shares within the scope of the fuel cost adjustment" (construing former 35 M.R.S.A. § 131)); *see also Maine Pub. Advocate*, 476 A.2d at 180.

[¶ 18] After remand, the Commission acted to compensate CMP retrospectively for its $5.7 million loss resulting from the Commission's erroneous calculation of the statutory fuel cost adjustment amount, and we upheld that order. *Maine Pub. Advocate*, 476 A.2d at 181–82. The Public Advocate contended in its appeal that the $5.7 million fuel cost adjustment returned to CMP should be offset by the amount of the $2.9 million reduction to *base rates* that would have occurred if the Commission had correctly factored the savings shares in the base rate calculation rather than in the fuel cost adjustment in the first place. *See id.*

[¶ 19] In denying the Public Advocate's appeal we said: "[t]he Commission is correct in its recognition that it cannot amend, via the fuel cost adjustment provisions ... what it now perceives to have been *error in the calculation of base rates* .... [I]mplementation of the offset proposal, no matter how ingeniously it might be characterized, would necessarily involve a reconsideration of the calculations made in the base rate proceeding." *Id.* at 183. (emphasis added). *Maine Public Advocate* reiterates that the prohibition against retroactive ratemaking precludes

the retroactive correction of prior inaccuracies or errors in the ratemaking process. *See id.* ("It is well established that *errors made in the calculation of a utility's base rates* may be remedied only prospectively.") (emphasis added).

[¶ 20] The BSCA rule's tracking account provision does not adjust rates to reflect prior errant cost or revenue projections formerly included in the utility's rates. Nor does the BSCA rule implicate the investors' rate of return. NET's rate of return is not improved or affected in any way by its ability to collect for the costs of the BSCA plan. What Chapter 204 does is isolate a specific operating expense—the cost of implementing the BSCA rule pursuant to a plan imposed on NET subsequent to the setting of the base rates—and impossible to calculate beforehand, and defers NET's recovery of that cost in order to meet, but not exceed, the return on investment previously determined to be just and reasonable in the rates that were in effect upon NET's implementation of the rule. Contrary to the contention of the Public Advocate, the holdings in the cases on which he relies do not prohibit the Commission's implementation of the surcharge pursuant to the BSCA tracking provision.

 [¶ 21] The rule against retroactive ratemaking serves two basic functions: (1) "it protects the public by ensuring that present consumers will not be required to pay for past deficits of the company in their future payments," *Narragansett Elec. Co. v. Burke*, 415 A.2d 177, 178 (R.I.1980); and (2) "it prevents the company from employing future rates as a means of ensuring the investments of its stockholders," thereby removing the utility's incentive to operate in an efficient, cost-effective manner. *Id.* at 179. In *Burke*, the utility was allowed a temporary rate increase to recoup extraordinary expenses it incurred after a severe ice storm. The existing rates in *Burke* did not factor in the extraordinary expenses of restoration of service necessitated by the ice storm. *See id.* Moreover, denying the recovery of those ice storm expenses would decrease the efficiency of the utility in Burke by removing any in-

---

**5.** A utility's reasonable estimate of its cost of fuel is one of the factors included in an electric

utility's operating expenses. *Maine Pub. Advocate,* 476 A.2d at 179–80.

centive to act quickly to address the extraordinary situation. *See id.* Here, as in *Burke*, the expansion of basic service calling areas throughout the state was not considered in setting the existing rates, and the rate adjustment was not used to insure or improve the return of investors in the utility. As in *Burke*, the reasons for the rule against retroactive ratemaking are not implicated by the implementation of the BSCA tracking mechanism.

▪ [¶ 22] Contrary to the contentions of the Public Advocate, the Commission's authorization of the surcharges pursuant to the BSCA tracking provision does not constitute retroactive ratemaking. The tracking account provision is authorized pursuant to the Commission's powers provided for by 35-A M.R.S.A. § 502(1) (1988).[6] The tracking provision functions as an accounting mechanism because it is premised on the impossibility of predicting the increased costs of expanded service required by the Commission's rule, and deferring the imposition of those costs to a time when they are known. *See Town of Norwood, Mass. v. F.E.R.C.,* 53 F.3d 377, 383 (D.C.Cir.1995) (distinguishing between permissible deferral of charges until the point at which they become ascertainable and impermissible practice of devising "a formula intended to estimate actual charges—to serve as a proxy for actual charges—and then go back and collect any shortfall caused by imperfections in that proxy"); *see also Popowsky v. Pennsylvania Pub. Util. Comm'n,* 695 A.2d 448, 452-53 (Pa.Cmwlth.1997) (not impermissible retroactive ratemaking to allow utility in base rate case to recover costs of complying with change in accounting standards from pay-as-you-go to accrual method because request did not arise out of inaccurate cost projection by utility); *Utilities Comm'n v. Nantahala Power & Light Co.,* 326 N.C. 190, 388 S.E.2d 118, 127 (N.C.1990) (order requiring utilities to place savings from federal tax decrease in deferred account to be refunded to ratepayers was not retroactive ratemaking, because it did not constitute

"adjustments to future rates to rectify undue past profits"); *Popowsky v. Pennsylvania Pub. Util. Comm'n,* 164 Pa.Cmwlth. 600, 643 A.2d 1146, 1149-50 (Pa.Cmwlth.1994) (recovery of transitional obligation in change from cash to accrual accounting qualifies as an unanticipated, extraordinary, and nonrecurring expense and an exception to the rule against retroactive ratemaking); *Cities for Fair Util. Rates v. Public Util. Comm'n of Tex.,* 884 S.W.2d 540, 550 (Tex.App.1994) ("The Commission's orders allowing deferred-accounting treatment do not inquire into the reasonableness of prior rates or allow the utility to recoup losses resulting from previously set rates which were insufficient. Furthermore, the deferred assets were not a factor in the old rates." (citations omitted)).

▪ [¶ 23] The Commission has reasonably broad implied powers. *See, e.g., New England Tel. & Tel. Co. v. Public Utils. Comm'n,* 470 A.2d 772, 779 (Me.1984) ("In addition to its powers expressly conferred by statute, the Commission has implied powers to the extent necessary to fulfill its obligations effectively."). It has the implied power to defer the imposition of the charge resulting from the tracking account deficit.

[¶ 24] The BSCA rule is the implementation of a statutorily authorized accounting practice. The rates in effect during the tracking period did not take into account the cost of implementing the basic service calling areas. The Commission took no action to change the utility's rate of return, and consciously undertook to avoid placing itself in the situation where it would have to correct rates that were incorrectly estimated. It authorized a surcharge to provide for substantial changes in revenue resulting from the BSCA rule imposed prior to the costs being incurred, the amounts of which were impossible to predict, and deferred the imposition of those costs to a time when the costs became known. This is not retroactive ratemaking beyond the Commission's power.

---

6. Title 35-A M.R.S.A. § 502(1) provides:
 The commission shall prescribe the forms of all books, accounts, papers and records required to be kept. Every public utility shall keep and render its books, accounts, papers and records accurately and faithfully in the manner and form prescribed by the commission and shall comply with all directions of the commission relating to its books, accounts, papers and records.

The BSCA rule is a sensible means of addressing an extraordinary cost imposed by the Commission upon NET and other LECs by the Commission. It assures that the rate of return established in rate proceedings before the BSCA change is not upset by the changes imposed by the Commission. It is consistent with utility industry practice allowing amortization of unusual and extraordinary costs during different periods than those in which the costs actually occurred to be reflected in future rates.

The entry is:

Order affirmed.

SAUFLEY, J., with whom ROBERTS, A.R.J., joins, dissents and files opinion.

SAUFLEY, Justice, with whom ROBERTS, Active Retired Justice, joins, dissenting.

[¶ 25] Because I conclude that the Basic Service Calling Area rule, M.P.U.C. Reg. 65–407, ch. 204 (June 25, 1994), constitutes retroactive ratemaking and that its promulgation was beyond the statutory authority of the Maine Public Utilities Commission, I must respectfully dissent.

[¶ 26] "It is axiomatic that 'the powers of the Public Utilities Commission are derived wholly from statute.'" *New England Tel. & Tel. Co. v. Public Utils. Comm'n,* 362 A.2d 741, 753 (Me.1976) (*NET II*) (citing *Stoddard v. Public Utils. Comm'n,* 137 Me. 320, 19 A.2d 427, 428 (1941)). Thus, when reviewing the actions of the Commission, "we must look to the statutes creating the Commission and endowing it with the power to regulate the public utilities of this State." *Id.* Our usual deference to the Commission's expertise will give way when the Commission is not explicitly or implicitly granted the authority to take the particular action under review.

[¶ 27] As the Court correctly recognizes, our past decisions clearly demonstrate that the Commission is without explicit or implicit authority to remedy past rates that are subsequently declared unjust or unreasonable. *See New England Tel. & Tel. Co. v. Public Utils. Comm'n,* 354 A.2d 753, 764 (Me.1976) (*NET I*) (holding that the Commission does not have the power to "establish 'temporary' rates as a means of providing an *after the fact remedy* for an *entirely past* situation no longer continuing at the time the Commission establishes 'temporary' rates"); *NET II,* 362 A.2d at 753 (holding that the Commission "lacks authority to attach refund or surcharge provisions to utility rate schedules"); *First Hartford Corp. v. Central Me. Power,* 425 A.2d 174, 181 (Me.1981) (holding that changes in statute did not change the "cardinal principle ... that the Commission had no express, implied, or incidental power to revise rates retroactively"); *Maine Pub. Advocate v. Public Utils. Comm'n,* 476 A.2d 178, 183 (Me.1984) (holding that even past errors that resulted in unjust or unreasonable rates cannot be remedied retroactively, because "[i]t is well established that errors made in the calculation of a utility's base rates may be remedied only prospectively").

[¶ 28] One of the philosophical difficulties with a system that prohibits retroactive correction of rates is that it anticipates and tolerates injuries to the system's participants during the periods of "regulatory lag"—the periods before the Commission is able to declare rates in existence to be unjust or unreasonable and to correct those rates prospectively. *See NET I,* 354 A.2d at 762; *NET II,* 362 A.2d at 748. The regulation at issue in this case assumes from the start that implementing the new basic service calling area will result in rates that, in the future, would be determined to be unjust and unreasonable. Accordingly, the regulation calls for a tracking period during which information concerning costs and revenues will be gathered to help the Commission to make a future determination as to what rates would be just and reasonable. Once that information is collected, the Commission and the regulated companies will use it to set new rates for future services that accurately reflect the costs of the new system and which provide enough revenue to ensure an adequate return on investment. *See Maine Pub. Advocate v. Public Utils. Comm'n,* 476 A.2d at 179. To that extent, the regulation is prospective in nature.

[¶ 29] Distinctly different from that action, however, is the provision in the BSCA rule that allows the regulated companies to

recover any losses that might have been incurred during the tracking period by increasing future rates in an amount sufficient to recover the shortfall. In this way, the Commission has attempted prospectively to ameliorate the expected "regulatory lag," during which either the consumer or the company would have suffered some loss, thereby attempting to solve the philosophical dilemma inherent in our statutory scheme. Such an approach, while a seemingly logical method of assuring just and reasonable rates, is nonetheless "merely an indirect route to retroactive ratemaking." *Id.* at 183. Indeed, there is no substantive difference between this regulation and the refund/surcharge provision we declared illegal in *NET II*,[7] where we said:

> The purpose of a refund/surcharge provision is to allow a regulatory body to determine after the fact that a certain rate was, when charged, too high or too low, and to adjust it by refund or surcharge. The ultimate result of such adjustment is that the rate charged during a specified period ... will be the rate which, it is later determined, was just and reasonable during that period.

362 A.2d at 757. Like that refund/surcharge provision, the BSCA regulation is an after-the-fact remedy for rates that have now been determined to be unjust or unreasonable—the only difference is that the BSCA regulation is carefully couched in terms designed to portray it as an accounting device rather than a mechanism to equalize revenue.

[¶ 30] Here, the simple reality is that the Commission approved NYNEX's recovery, through an increase in future rates, of a shortfall of $6 million that was incurred during the two years between implementation of the BSCA rule and the date of the Commission's final order. In other words, during that two-year period, NYNEX received $6 million less than what was determined at the end of the two year period to be just and reasonable, and the Commission approved a plan to *recover that loss by increasing its future rates.* This is a classic example of retroactive ratemaking.

[¶ 31] The Court goes awry today in its conclusion that, by announcing in advance its process for retroactive ratemaking, the regulation constitutes a deferred accounting mechanism which is authorized by the Commission's statutory power to "prescribe the forms of all books, accounts, papers and records required to be kept." 35-A M.R.S.A. § 502(1) (1988).[8] In so doing, the Court has relied on specific decisions from other jurisdictions and has fallen prey to the inconsistent approaches to ratemaking that exist in those jurisdictions. Commenting on the application of the rule in Illinois, one author noted that:

> The [Illinois] cases are good examples of how the courts have had difficulty applying the rule against retroactive ratemaking in a socially beneficial fashion in the modern context. [M]ost courts have applied it in the same manner as the Illinois courts: *they pledge fidelity to it but either ignore the rule or develop ad hoc exceptions to it when it stands in the way of the decision they want to make.*

7. In *NET II*, the parties attempted to distinguish the planned refund/surcharge provision from retroactive ratemaking by arguing that it was, in fact, prospective in nature, "since both the utility and the public knew, *before the amounts later to be refunded or surcharge accrued,* that a refund or surcharge could be collected." 362 A.2d at 753 n. 17. We dismissed that argument in a footnote, *see id.,* and held that even if the provision was prospective in nature, it was still promulgated without the statutory authority to engage in retroactive ratemaking. *See id.* at 757–58.

8. Furthermore, the court ascribes too much importance to the Commission's emphasis on the fact that the BSCA regulation was intended to be "revenue-neutral" and to operate without effect on investors' rates of return. The fact that the BSCA regulation will not result in any additional net *income* for the companies that it regulates is irrelevant to a determination of whether it constitutes retroactive ratemaking. Although courts have recognized that one purpose for declining to allow retroactive ratemaking is to prevent a utility "from employing future rates as a means of ensuring the investments of its stockholders," *Narragansett Electric Co. v. Burke,* 415 A.2d 177, 179 (R.I.1980) (citing *Georgia Ry. & Power Co. v. Railroad Comm'n,* 278 F. 242, (D.Ga.1922)), our focus has always been on whether the rate is designed to compensate the company or the customers for a rate that has been in effect and that has been, for whatever reason, declared unjust and unreasonable. *See Maine Pub. Advocate v. Public Utils. Comm'n,* 476 A.2d at 183.

Stefan H. Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings,* 1991 U. ILL. L. REV. 983, 992 (emphasis added).

[¶ 32] Relying on decisions that have announced creative exceptions to the rule, the Court appears to agree that it is not retroactive ratemaking "to *defer* collection of certain charges until the point at which they become ascertainable, so long as the rate payers have notice that the charges will be collected in the future." *Town of Norwood, Mass. v. Federal Energy Regulation Comm'n,* 53 F.3d 377, 383 (D.C.Cir.1995), and that, "the Commission may authorize deferred-accounting treatment for post-in-service costs" because simply "reducing the impact of regulatory lag does not equate to retroactive ratemaking." *Cities for Fair Util. Rates v. Public Util. Comm'n,* 884 S.W.2d 540, 550 (Tex.App. 1994).

[¶ 33] I do not find such exercises in semantics to be persuasive. By any other name the accounting practices engaged in here result in rates that are established retroactively. Unfortunately, the Court has now become one of many courts that "while maintaining verbal allegiance to the retroactivity rule, attempt to distinguish it away for a particular set of circumstances." [9] The creation of such an *ad hoc* exception to the rule will result in uncertainty in its application and leave the parties with little guidance in future disputes.

[¶ 34] The Court appears to have been swayed by the sensibility and logic of allowing utilities to defer recovery of their costs until reliable data is collected, allowing for more accuracy and fairness · in ratemaking. Indeed, the BSCA process at issue in this case appears to be a sensible and fair way to deal with the dilemma of regulatory lag. The Public Utilities Commission's powers, however, are derived wholly from statute, and retroactive ratemaking, even when characterized as an accounting device, is an *ultra vires* act.

[¶ 35] Thus, the decision whether to allow the Public Utilities Commission to adopt regulations such as the BSCA is not, in my opinion, ours to make. By its decision today, the Court has begun the piecemeal dismantling of the rule against retroactive ratemaking in Maine and has delegated to the PUC authority not given to it by the Legislature, thereby opening the door to any retroactive ratemaking which is signalled by advance regulation.

[¶ 36] If the time has come to reexamine the validity and flexibility of the rule, that process should be undertaken by the Legislature. Any decision to eliminate or reduce the prohibition on retroactive ratemaking should be made, not by the Court, but by the Legislature. Until the Legislature acts, our role is not to judge whether the BSCA regulation is a good, sensible, or fair rule, but rather simply to judge whether the Public Utilities Commission has the statutory authority to adopt such a rule.

[¶ 37] Because I conclude that the Commission does not have that authority, I would vacate the orders of the Public Utilities Commission.

---

9. Krieger, *supra,* at 1047.